**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
lrosen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALEXANDRA K. BARNISH, Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> LI-CYCLE HOLDINGS CORP. F/K/A PERIDOT ACQUISITION CORP., AJAY KOCHHAR, and BRUCE MACINNIS, <br><br> Defendants. | Case No. <br><br> CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> <u>CLASS ACTION</u> |

Plaintiff Alexandra K. Barnish ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Li-Cycle Holdings Corp. f/k/a Peridot Acquisition

Corp. ("Li-Cycle" or the "Company"), analysts' reports and advisories about the Company, and other information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of the Company between February 16, 2021 and March 23, 2022, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.      This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this judicial district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

5.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the alleged misstatements entered and subsequent damages took place within this judicial district.

6.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

7.     Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was economically damaged thereby.

8.     Defendant Li-Cycle purportedly is an industry leader in lithium-ion battery resource recovery and the leading lithium-ion battery recycler in North America.  On August 10, 2021, Li-Cycle merged with Peridot Acquisition Corp. ("Peridot"), a special purpose acquisition company ("SPAC") also called a blank check company.

9.     The Company is incorporated in Ontario, Canada with its headquarters in Toronto.  The Company recycles and recovers lithium-ion battery materials using its facilities in Ontario and New York, and it is currently building and developing its first commercial Hub facility—i.e., a centralized facility for large-scale production of specialty materials—in Rochester, New York.

10.     Shares of the Company have been listed on the New York Stock Exchange ("NYSE") under the ticker symbol "LICY" since August 11, 2021.  Prior to the merger, the Company's ordinary shares traded on the NYSE under the ticker symbol "PDAC."

11.     Defendant Ajay Kochhar ("Kochhar") is a co-founder of Li-Cycle, and has served as President, Chief Executive Officer ("CEO"), and a director of the Company since the consummation of the merger on August 10, 2021.

12.     Defendant Bruce MacInnis ("MacInnis") served as the Company's Chief Financial Officer ("CFO") since the consummation of the merger on August 10, 2021 until he retired on January 31, 2022.

13.     Defendants Kochhar and MacInnis are sometimes referred to herein as the "Individual Defendants."

14.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

15.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all the wrongful acts complained of herein were carried out within the scope of their employment.

16.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

17.     The Company and the Individual Defendants are referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

18.     On February 16, 2021, the Company filed with the SEC a Form 8-K (the "February 15, 2021 8-K"), which attached a press release entitled "Li-Cycle, North America's Largest Lithium-Ion Battery Resource Recycling Company, to List on NYSE through Transaction with Peridot Acquisition Corp." (the "Merger Announcement Press Release").  The Merger Announcement Press Release stated the following about Li-Cycle's business:

> Li-Cycle utilizes a breakthrough, commercial process for sustainably recovering critical high-grade materials from battery manufacturing scrap and end-of-life batteries, creating a closed-loop, domestically sourced lithium-ion battery supply chain. Li-Cycle patented technology enables a shift away from legacy thermal recycling technologies, which can emit harmful emissions and result in lower recovery rates.

19.     The Merger Announcement Press Release explained that "Li-Cycle is expected to receive approximately $615 million in gross transaction proceeds, ***enabling the company to fully fund its planned global expansion***." (Emphasis added).  Defendant Kochhar further commented that "[t]he capital raised in this transaction will ***fully fund our planned global growth***. We are excited to partner with the Peridot team and enter the public markets, deliver on our mission and create long-term value for our customers, employees and shareholders." (Emphasis added).

5

20.     The Merger Announcement Press Release listed several "[k]ey investment highlights," including:

> **Robust Customer Network** – Li-Cycle as 40+ commercial contracts with blue chip suppliers and off-take agreements through 2030, corresponding to a cumulative forecasted EBITDA between 2021 and 2025 of $985 million. ***More than $300 million/year of revenue is to be generated from contracted off-take agreements with Traxys [Traxys North America LLC], both an investor in the PIPE and an existing strategic partner***. The Company's commercial battery supply customers include 14 of the largest global automotive and battery manufacturers.

(Emphasis added).

21.     On January 31, 2022, the Company filed with the SEC on Form 20-F its annual report for the fiscal year ended October 31, 2021 ("2021 Annual Report"), which was signed by Defendant Kochhar.  The financial statements of the Company were attached as an exhibit to the 2021 Annual Report, which stated in pertinent part:

|  | Notes | Year ended October 31, | |
|---|---|---|---|
|  |  | 2021 $ | 2020 $ |
| **Revenue** |  |  |  |
| Product sales |  | 6,930,475 | 554,914 |
| Recycling services |  | 444,401 | 237,340 |
|  |  | 7,374,876 | 792,254 |
| **Expenses** |  |  |  |
| Employee salaries and benefits, net |  | 12,709,823 | 2,819,195 |
| Professional fees |  | 7,688,520 | 2,962,261 |
| Share-based compensation | 12 | 3,982,943 | 332,634 |
| Raw materials and supplies |  | 3,410,014 | 591,881 |
| Office, administrative and travel |  | 3,148,871 | 476,733 |
| Depreciation | 7,14 | 2,899,345 | 1,095,250 |
| Research and development, net |  | 2,662,572 | 276,668 |
| Freight and shipping |  | 1,033,149 | 137,010 |
| Plant facilities |  | 1,030,947 | 390,687 |
| Marketing |  | 973,695 | 336,820 |
| Change in Finished Goods Inventory |  | (307,817) | (14,022) |
|  |  | 39,232,062 | 9,934,117 |

22.     Also attached to the 2021 Annual Report was the management's discussion and analysis of financial condition and results of operations, which stated the following about the Company's revenue recognition:

> Li-Cycle recognizes revenue from: (i) sales of products, which currently include three intermediate products, being black mass, mixed copper/aluminum and mixed plastics from Li-Cycle's Spokes; and (ii) providing the service of recycling lithium-ion batteries, which includes coordination of logistics and destruction of batteries. We expect Li-Cycle's sales of products to increase as a percentage of overall revenue as more Spokes and Hubs become operational over time. Li-Cycle expects to recognize revenue from sales of end products, including nickel sulphate, cobalt sulphate and lithium carbonate, after its first Hub becomes operational.
>
> For product sales, revenue is recognized when control of the goods has transferred, meaning when the goods have been shipped to the customer's location (delivery). *A receivable is recognized by Li-Cycle when the goods are delivered to the customer*, as this represents the point in time at which the right to consideration becomes unconditional, as passage of time is the only condition to payment becoming due.

(Emphasis added).

23.     The management's discussion and analysis of financial condition and results or operations also stated the following about certain related party transactions:

> From January 1, 2019 to December 31, 2021, the Company leased certain office space from Ashlin BPG Marketing, which is controlled by certain members of the immediate family of the Company's President and Chief Executive Officer. Under the terms of the lease, the Company was required to pay Cdn. $4,500 per month plus applicable taxes, subject to 60 days' notice of termination. Li-Cycle terminated the lease, effective December 31, 2021. During the twelve months ended October 31, 2021, the Company incurred expenses of $39,866 in relation to this vendor, as compared to $35,505 for the twelve months ended October 31, 2020.
>
> *               *               *
>
> The Company has engaged Ashlin BPG Marketing, which is controlled by certain members of the immediate family of the Company's President and Chief Executive Officer, to provide it with marketing items and employee gifts since April 1, 2020. During the twelve months ended October 31, 2021, the Company

incurred expenses of $46,640 attributable to this vendor, as compared to $5,405 for the twelve months ended October 31, 2020.

24.     On March 17, 2022, the Company filed with the SEC a Form 6-K (the "March 17, 2022 Form 6-K"), which was signed by Defendant Kochhar.  The March 17, 2022 Form 6-K attached a press release entitled "Li-Cycle Reports First Quarter 2022 Financial Results; Significant Milestone Achieved for Rochester Hub Project" (Q1 2022 Financial Results Announcement).  The Q1 2022 Financial Results Announcement stated that "[r]evenues for the quarter ended January 31, 2022 increased 277% to $3.8 million, compared to $1.0 million in the same quarter last year."

25.     The Q1 2022 Financial Results Announcement reported the following financial statements:

|  | Three months ended January 31, | |
|---|---|---|
|  | 2022 | 2021 |
|  | $ | $ |
| **Revenue** | | |
| Product sales | 3,622,447 | 912,866 |
| Recycling services | 215,523 | 104,374 |
|  | 3,837,970 | 1,017,240 |
| **Expenses** | | |
| Employee salaries and benefits | 7,778,660 | 1,698,199 |
| Professional fees | 2,874,039 | 2,434,134 |
| Share-based compensation | 5,198,809 | 746,171 |
| Raw materials and supplies | 1,413,842 | 414,102 |
| Office, administrative and travel | 2,844,540 | 304,241 |
| Depreciation | 1,834,075 | 527,378 |
| Research and development | 341,786 | 527,195 |
| Freight and shipping | 210,361 | 291,050 |
| Plant facilities | 437,070 | 214,134 |
| Marketing | 448,945 | 141,655 |
| Change in Finished Goods Inventory | (811,434) | (77,632) |
|  | 22,570,693 | 7,220,627 |
| Loss from operations | (18,732,723) | (6,203,387) |
| **Other (income) expense** | | |
| Fair value (gain) loss on financial instruments | (50,871,565) | — |
| Interest expense | 3,741,242 | 250,689 |
| Foreign exchange (gain) loss | (11,453) | 391,964 |
| Interest income | (137,587) | (717) |
|  | (47,279,363) | 641,936 |
| **Net profit (loss) and comprehensive income (loss)** | 28,546,640 | (6,845,323) |
| **Earnings (loss) per common share – basic** | 0.17 | (0.07) |
| **Earnings (loss) per common share – diluted** | 0.17 | (0.07) |

26.     The March 17, 2022 Form 6-K also attached the Company's consolidated interim financial statements for the period ended January 31, 2022, which reported the following accounts receivable:

**Accounts receivable**

|  | January 31, 2022 | October 31, 2021 |
|---|---|---|
|  | $ | $ |
| Trade Receivables | 5,815,394 | 4,072,701 |
| Total accounts receivable | 5,815,394 | 4,072,701 |
| Harmonized Sales Taxes receivable | 710,824 | 379,814 |
| Other | — | 593,331 |
| Total other receivables | 710,824 | 973,145 |

For product sales, the Company estimates the amount of consideration to which it expects to be entitled under provisional pricing arrangements. For the three months ended January 31, 2022, the fair value gain arising from changes in estimates was $1,738,469 (three months ended January 31, 2021: $275,503) included in the respective accounts receivable balance.

An insignificant portion of the receivables relate to services revenue which is initially measured at fair value and subsequently at amortized cost. For the three months ended January 31, 2022 and October 31, 2021, the Company has assessed an allowance for credit loss of $nil for service-related receivables based on its past experience, the credit ratings of its existing customers and economic trends.

27.     The statements referenced in ¶¶18-26 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Li-Cycle's largest customer, Traxys, is not actually a customer, but merely a broker providing working capital financial to the Company while Traxys tries to sell Li-Cycle's product to end customers; (2) the Company engaged in highly questionable related party transactions; (3) the Company's mark-to-model accounting is vulnerable to abuse and gave a false impression of growth; (4) a significant portion of the Company's reported revenues were derived from simply marking up receivables on products that had not been sold; (5) the Company's gross margins have likely been negative since inception; (6) the Company will

require an additional $1 billion of funding to support its planned growth (which is a figure greater than the Company raised via the merger); and (7) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

### The Truth Emerges

28.    On March 24, 2022, before market hours, market researcher Blue Orca Capital released a report on Li-Cycle (the "Report"), which described the Company as "a near fatal combination of stock promotion, laughable governance, a broken business hemorrhaging cash, and highly questionable Enron-like accounting." Among other things, the Report alleged that the Company's revenues are based on "an Enron-like mark-to-model accounting gimmick," and that "Li-Cycle diverted $529,902 in investor capital to the family [] of its founders through a series of highly questionable related party payments." The Report also alleged that the Company's "cash burn is so severe and far above previous guidance" which "will require the Company to raise at least $1 billion . . . in large part by massively diluting current shareholders."

29.    With regard to the related party transactions, the Report alleges that "Despite hemorrhaging cash and likely requiring multiple near-term infusions of capital, Li-Cycle diverted half a million in investor capital to the family entourage of its founders through a series of highly questionable related party payments." For example, the Report alleges that Li-Cycle "paid an aggregate $167,553 to Ashlin BPG Marketing ("Ashlin"), a Canadian leather goods producer run by Ashok Kochhar, a family member of Li-Cycle's president and CEO, Ajay Kochhar" for "marketing items and employee gifts." According to "Ashlin's website, the most expensive item is $379.31 [but] Li-Cycle spent 226x this amount buying employee gifts and marketing trinkets." The Report questioned how "a startup that is hemorrhaging cash and struggling to get the necessary capital to launch its business [could] spend tens of thousands of dollars on cheap

wallets and bags."  Moreover, the Report alleges that "Li-Cycle also spent C$4,500 a month to

share a lease with Ashlin in Mississauga, Ontario" even though "one of the units in the same

building was recently leasing for C$1,200 per month." According to the Report, this meant that

"Li-Cycle [] likely overpaid for a lease from the CEO and/or his family."

30.     The Report also alleged that the Company's mark-to-model accounting, which it

described as "Enron-esque," was vulnerable to abuse and gave a false impression of growth.  The

Report alleged, in pertinent part:

> In our opinion, Li-Cycle's accounting is reminiscent of Enron – as a significant portion of the Company's revenues are not derived from bona fide sales of recycled product to end customers, but rather Li-Cycle's provisional estimates of the value of such product delivered to its brokers.
>
> Li-Cycle's largest customer, and the foundation for its future revenue projections, is Traxys North America LLC ("Traxys") – a large commodities trader that is also an investor in Li-Cycle.  The contract with Traxys accounts for not only the majority of Li-Cycle's revenues, but also a substantial portion of Li-Cycle's revenue projections to investors.  Yet analyzing the details of the contract, it becomes evident that Traxys is not really a customer, but merely a broker providing working capital financing to the Company while Traxys attempts to sell Li-Cycle's product to end customers.  Traxys is not the end customer, it bears no commodity price risk, and charges Li-Cycle interest on any cash advanced to the Company prior to final sale to the end buyer.  Yet Li-Cycle somehow recognizes revenue immediately upon delivery to its brokers, potentially months before any sale has occurred.
>
> The Company's revenue is based on its provisional estimate of the value of the black mass delivered to its investor/broker, not the price ultimately paid for the product by the end customer.  Li-Cycle in effect uses mark-to-model accounting, pulling sales forward from future periods and recognizing revenues based on its own self-serving estimates.  But that is not all, as this mark-to-model accounting framework allows the Company to juice its revenues with non-cash gains on previously recognized revenues.
>
> We calculate that **45% of Li-Cycle's reported revenues** in the last quarter were derived from simply marking up receivables on products that had not been sold.

*                *                *

> *Under Li-Cycle's bizarre mark-to-model accounting framework, it appears that Li-Cycle books these gains straight into their current period revenue, boosting its top line with unrealized gains on prior transactions.  We question whether this highly aggressive accounting caused <u>Li-Cycle's auditor and CFO to resign</u>, both of whom abruptly left the Company following the end of the last fiscal year.*

(Emphasis added).

31.     The Report further alleged that the Company's largest customer, Traxys, is not actually a customer, stating in pertinent part:

> Li-Cycle reports sales of black mass to Traxys, with revenue recognized upon delivery of the product to Traxys.  This seems, at first glance, to be a standard customer relationship with a commodity producer.  But dig deeper and any semblance of normalcy unravels.

> \*                  \*                  \*

> First, it is critical to note that Traxys is **actually not the end customer**, but a broker or marketing partner that on-sells Li-Cycle's black mass to end buyers.  Despite recognizing revenue on sales to Traxys, Li-Cycle is actually selling **<u>through</u>** Traxys, not to it.

> \*                  \*                  \*

> Not only is Traxys not the end buyer, but the revenue recognized by Li-Cycle is merely Li-Cycle's **<u>initial estimate</u>** of the price of the product it expects to receive from the end customer once the final deal is complete.  Once Traxys sells the goods to an end customer, it passes through this revenue, ***<u>minus costs and a marketing fee</u>***, to Li-Cycle.

> \*                  \*                  \*

> Traxys is a commodity broker, taking a marketing fee (e.g., a commission) on the sale of product from Li-Cycle to an end customer.  Yet Li-Cycle recognizes revenue not when the final consideration is paid and the goods are received by the end customer, but upon delivery to Traxys, its broker.

> While Traxys is attempting to sell the product, although it takes title to the goods and assumes collection risk, Traxys assumes virtually none of the other risk associated with selling the black mass – leaving Li-Cycle financially accountable for (1) commodity price changes, (2) damage or loss, (3) timing and interest rate risk, (4) insurance, and (5) non-compliant goods.

32. The Report further explained how Li-Cycle's financials are contingent on this mark-to-model accounting model:

> Not only do we believe that it is inappropriate to recognize revenue on the initial delivery of goods to the Company's broker, but the provisional nature of the initial price estimate is ripe for abuse and reminiscent of Enron's mark-to-model accounting.
>
> There are two problems with Li-Cycle's financial statements. **_First, they pull forward future sales that have not been completed into the current period, giving an impression of growth even though no end customer has purchased the product._**
>
> **_The second problem is that Li-Cycle recognizes revenue based on its provisional estimate of the value of the commodities, not the final sales price to an end customer. If the final consideration paid by the end customer differs from Li-Cycle's estimate, rather than recognizing the differences as other income, Li-Cycle simply makes a balance sheet adjustment to its accounts receivable and juices its revenue._** This gives Li-Cycle considerable discretion over its revenues, including the discretion to increase revenues by marking up receivables on unsold black mass already delivered to its brokers and recognized as revenues in prior periods.

(Emphasis added).

33. The Report claims that "Li-Cycle's bizarre mark-to-model accounting framework allows the Company to juice its revenues with non-cash gains by upwardly revising previously recognized revenues in the current period." The Report states, in pertinent part:

> Although Li-Cycle recognizes revenue immediately upon delivery of goods to its broker, it only receives part of the estimated consideration initially as an interest-bearing loan from Traxys. Li-Cycle categorizes the rest of the estimated consideration as a receivable.
>
> These receivables have ballooned, with the balance of receivables equal to 134% of revenues as of Q1 FY22.
>
>      *      *      *
>
> Although Li-Cycle recognizes revenue immediately upon delivery of goods to its broker, it only receives part of the estimated consideration initially as an interest-

bearing loan from Traxys. Li-Cycle categorizes the rest of the estimated consideration as a receivable.

These receivables have ballooned, with the balance of receivables equal to **134%** of revenues as of Q1 FY22.

        *          *          *

Notably, Li-Cycle also recognizes non-cash gains on the **upward revision on the value of its receivables**, on the basis that Li-Cycle has increased its estimate of the value of product not yet sold to end customers.

        *          *          *

Normally, we would expect a non-cash gain from a revision on an asset to show up on the income statement below the line as 'other income.' But curiously, Li-Cycle reports no such line item. Indeed, of all the line items reported on income statement, the only one where a $1.7 million gain could fit is in **revenues**.

        *          *          *

Li-Cycle has some discretion to determine the value of its own revenues, given the provisional nature of the initial price estimate. According to the footnotes in its financial statements, it has been recognizing gains on accounts receivable by upwardly revising such estimates on unsold product. ***By elimination, we believe that such gains are actually being appended to Li-Cycle's top line revenues, which if true, would be absurd, especially considering that these gains accounted for 45% of reported total revenue in Q1 FY22***. (Emphasis added).

34. The Report further alleged that Li-Cycle is able to "obscure its financial health" by hiding negative gross margins on its income statements, thereby "omitting costs of goods sold and including most costs under a nebulous expense category." The Report states, in pertinent part:

Presented in this format, Li-Cycle seems to imply healthy gross margins. For example, in FY21, Li-Cycle reported raw materials and supply expenses of $3.1 million. When compared to its revenues of $7 million, this seems to imply an impressive gross margin of 55% in FY21. In the latest quarter, the Company's implied gross margin grew to 83%.

        *          *          *

14

However, the footnotes to its financial statements, Li-Cycle reports that its cost of inventories recognized as expenses were $8.55 million in FY21.  These inventory expenses exceeded reported revenues that year and were well above the amount that the Company reported on its income statement as raw material and supply expenses in FY 21.

*          *          *

*If we consider these expenses buried in the footnotes, we calculate that Li-Cycle's gross margins were -48% in FY20 and -23% in FY21.  If we aggregate the Company's financials since FY 2020 (effectively inception), Li-Cycle's costs of inventories have exceeded revenues, indicating that its gross margins on battery recycling are likely negative.*

*          *          *

Not only do negative margins contradict the Company's disclosures in its SPAC presentations regarding the profitability of its business but suggest that Li-Cycle's business is neither scalable nor economically viable.  *Yet because of the way Li-Cycle obfuscates its income statement, this is hidden from investors who may be forgiven for ignoring key disclosures buried in the footnotes.*

*          *          *

*By not reporting a proper income statement, we think that Li-Cycle gives investors the misleading impression that at least its business is profitable on a gross basis.*  But based on our read of the footnotes, we think that Li-Cycle's gross margins are likely **negative**, indicating that Li-Cycle's recycling business is neither scalable nor economically viable.

(Emphasis added).

35.     Finally, the Report alleged that Li-Cycle likely requires an additional $1 billion in near term capitol, stating, in pertinent part:

Following its de-SPAC, costs and anticipated capital expenditures have risen sharply.  Morgan Stanley estimated in recent note downgrading the stock that cost and capital expense overruns increased its estimate of the Company's FCF burn (2022-2026) from $643 million to ~$1.85 billion, a 3x increase.  As a result, *analysts estimate that Li-Cycle burns cash so much more rapidly than it initially told investors, it will need to raise $1 billion in additional capital, likely in the form of debt and dilutive equity issuances*.  (Emphasis added).

We agree.  By our calculation, Li-Cycle's stated capital investments will require the Company to raise at least $1 billion – **102% of its current enterprise value** –

likely through debt and dilutive equity issuances. This is fatal to the bull case for the stock: even if investors ignore Li-Cycle's nightmarish corporate governance, questionable accounting, and negative margins, they will likely be so badly diluted that even if they win, they lose.

36. On this news, Li-Cycle shares fell $0.47 per share, or approximately 5.6%, to close at $7.93 per share on March 24, 2021, on unusually heavy trading volume, damaging investors.

37. As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

38. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of the Company during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

39. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be

notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

41.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

42.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants' acts as alleged violated the federal securities laws;

(b)     whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)     whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)     whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e)     whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f)     whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

43.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

44.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the NYSE, and was covered by market analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities;

(g)     Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented

material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(h)    Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

45.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

46.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

<u>**COUNT I**</u>

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

47.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.    This Count is asserted against the Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

49.    During the Class Period, the Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

50.     The Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

51.     The Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

52.     Individual Defendants, who are a senior officers and directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

53.     As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Defendants' false and misleading statements.

54.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Defendants' misleading statements and by the material adverse information which the Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

55.      As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

56.     By reason of the foregoing, the Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of The Exchange Act
Against The Individual Defendants**

57.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

58.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the

conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

59.     As officers and directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

60.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were each a "controlling person[]" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

61.     The Individual Defendants, therefore, acted as controlling persons of the Company. By reason of their senior management positions and being a director of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

62.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 19, 2022                  Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Phillip Kim
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, NY 10016
Tel: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com

Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*