**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com
Email: blapointe@rosenlegal.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| THE LANIGAN GROUP, INC., Individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> LI-CYCLE HOLDINGS CORP. F/K/A PERIDOT ACQUISITION CORP., AJAY KOCHHAR, TIM JOHNSTON, BRUCE MACINNIS, SCOTT PROCHAZKA, ALAN LEVANDE, MARKUS SPECKS, PRESTON POWELL, JONATHAN SILVER, and JUNE YEARWOOD; <br><br> Defendants. | Case No. 1:22-cv-02222-HG-RML <br><br> **AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> <u>CLASS ACTION</u> |

Lead Plaintiff The Lanigan Group, Inc. ("Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included,

among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Li-Cycle Holdings Corp. f/k/a Peridot Acquisition Corp. ("Li-Cycle" or the "Company"), analysts' reports and advisories about the Company, and other information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

A.    **INTRODUCTION**

1.    This is a federal securities class action brought pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who: (1) held units, shares, and/or warrants of Peridot Acquisition Corp. ("Peridot" or "PDAC") and were eligible to vote at PDAC's extraordinary general meeting on or about August 5, 2021, seeking to pursue remedies under Section 14(a) of the Exchange Act, and/or; (2) purchased or otherwise acquired Li-Cycle Holdings Corp. ("Li-Cycle" or the "Company") ordinary shares pursuant or traceable to the Registration Statement (as defined herein) and/or Peridot's Proxy Statement and Prospectus issued in connection with the August 10, 2021 Business Combination (as defined herein), seeking to pursue remedies under Sections 11 and 15 of the Securities Act. [1]

2.    On February 16, 2021, Carnelian Energy Capital Management, L.P. ("Carnelian"), a sponsor of special purpose acquisition companies ("SPACs," or blank check companies) together with Li-Cycle, announced a proposed business combination where Li-Cycle

---

[1] Excluded from the Class are Defendants herein, the officers and director of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

would become a publicly traded company by merging with a Carnelian-sponsored SPAC called Peridot Acquisition Corp. ("Peridot") (the "Business Combination").

3.      To solicit investors, Li-Cycle and Peridot issued a series of public statements, including Peridot's proxy statement and prospectus, filed with the SEC pursuant to Rule 424(b)(3), dated July 15, 2021 (the "Proxy Statement and Prospectus"); and Li-Cycle's registration statement filed with the SEC on Form F-4, initially dated March 29, 2021, as subsequently amended (the "Registration Statement").

4.      In the Registration Statement, Defendants described Li-Cycle's "breakthrough commercial technology" and "mission to close the battery supply-chain loop". Defendants touted Li-Cycle's "non-combustion" recycling process, which the Company claimed increased its recovery factors by up to 95%. Li-Cycle represented that it was able to capture substantially higher revenue than its competitors through its "breakthrough" incineration-free recycling process.

5.      According to Defendants, Li-Cycle had developed a new method of recycling lithium-ion batteries, extracting the valuable rare-earth metals for reuse without the necessity of incineration—thereby avoiding the inevitable air pollution associated with that process, and (again, according to Li-Cycle) yielding at significantly higher efficiency.

6.      Prior to the Business Combination, Li-Cycle represented that its reported revenues and accounts receivable were reported in conformity with International Financial Reporting Standards ("IFRS"). The Company's financial statements were incorporated into Li-Cycle's Registration Statement and Peridot's Proxy Statement and Prospectus issued in connection with the Business Combination. Almost immediately after the Business Combination was completed on August 10, 2021, the Company's subsequent SEC filings began to reveal

additional information about its accounting. The reality was that Li-Cycle had misreported revenue and profit by (1) recording "sales" on inventory for which it received advance "provisional payments" pursuant to its "off-take" agreement with a partner, Traxys North America LLC ("Traxys")—when in truth, these payments were merely an extension of credit, for which Traxys charged Li-Cycle interest—while Traxys—a commodities broker—attempted to market the goods to actual customers; and (2) even after recognizing revenue on these transactions, Li-Cycle continuing to adjust the book value of its receivables based on its "Mark-to-Model" calculation of expected realizable value, generating gains which were recorded as additional revenue after Li-Cycle had ostensibly finalized the sales.

7.      Defendants recognized revenue on sales long before any actual sale is negotiated, valuing each purported delivery to Traxys at the amount Li-Cycle projected it would eventually receive upon ultimate sale of the goods, and recording the proceeds of "provisional payments" (which were actually extensions of credit, for which Li-Cycle paid interest) from Traxys as cash without recording any offsetting liability. Li-Cycle then recorded the difference between the credit it received from Traxys and its "Mark-to-Model" valuation of the goods as an account receivable—despite the fact that no goods had been delivered and no customer had incurred any obligation to pay. Then, despite having recorded such sales as having already occurred, Li-Cycle continued to "adjust" its recorded receivables to track its model for the expected future market price of the commodities, marking the receivables up based on its projected increases in commodity prices, and recording the purported gains as additional revenue.

8.      In reality, Li-Cycle retained exposure to all substantive risk of loss on the inventory long after it recorded revenue—until such time as Traxys brokered a sale and delivered

the goods to a customer. Until a sale actually occurred, Li-Cycle retained exposure to changes the commodity prices of its inventory.

9.      Li-Cycle's financial reporting violated International Financial Reporting Standards ("IFRS"), with which the Registration Statement and Proxy Statement claimed that the Company complied.

10.     In the early morning of March 24th, 2022, before the market opened, Blue Orca Capital released a report revealing the reality: that Traxys was really just a middle-man, arranging sales to third-parties and handling logistics, taking possession of Li-Cycle's inventory months before an actual sale would be expected to close, while lending Li-Cycle a portion of the expected ultimate sales price in the interim through a Working Capital Facility—funds for which Li-Cycle was obligated to pay Traxys interest. Li-Cycle continued to bear all significant risk until the goods were actually delivered—and was obligated to pay back some or all of the "provisional payment" amount if the price dropped before the sale closed, or if the transaction fell through. Yet, Li-Cycle recognized and reported revenue on each delivery to Traxys immediately—not just for the amount of the cash Traxys lent it, but recording a receivable for the difference between that amount and the ultimate price Li-Cycle predicted under its own model of future commodity prices. Then, if Li-Cycle's prediction of the ultimate market price of the commodities increased while the sale was still pending, Li-Cycle would mark up the receivables, recognizing phantom gains that further inflated reported revenue in the present period.

11.     On Blue Orca's revelation of the true nature of Li-Cycle's arrangement with Traxys, the price of its stock collapsed, and investors were left holding the bag.

B.      **JURISDICTION AND VENUE FOR PLAINTIFF'S EXCHANGE ACT CLAIMS**

12.      Plaintiffs' Exchange Act claims arise under Section 14(a) of the Exchange Act (15 U.S.C. §§ 78n(a).

13.      This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

14.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements entered and subsequent damages took place in this Judicial District. According to its Proxy Statement and Prospectus filed with the SEC on July 15, 2021, Peridot had issued 30,000,000 units in connection with its SPAC IPO, each of which consisted of one Class A share and one-half warrant to purchase an additional share in Peridot. Peridot's units, and later its shares and warrants separately, were listed and traded on the NYSE. Accordingly, there were presumably hundreds, if not thousands, of investors in Peridot units located in this Judicial District.

15.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications and the facilities of a national securities exchange.

C.      **JURISDICTION AND VENUE FOR PLAINTIFF'S SECURITIES ACT CLAIMS**

16.      Plaintiff's Securities Act claims arise under Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

17.      This Court has jurisdiction over the subject matter of this action under §22 of the Securities Act, 15 U.S.C. §¶ 77v, and 28 U.S.C. §1331.

18.     Venue is proper in this District under Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1391(b) because many of the acts and conduct that constitute the violations of law complained of herein, including the dissemination to the public of false and materially misleading information, occurred in this District. According to its Annual Report filed with the SEC on January 31, 2022 on Form 20-F, as of January 30, 2022, Li-Cycle had 168,891,877 ordinary shares and 20,300,000 warrants to purchase ordinary shares issued and outstanding. Li-Cycle's common stock trades on the NYSE. Accordingly, there are presumably hundreds, if not thousands, of investors in Li-Cycle's ordinary shares located within the U.S., some of whom undoubtedly reside in this Judicial District.

19.     In connection with the acts, conduct, and other wrongs alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

### D.     **PARTIES**

#### Plaintiff

20.     Lead Plaintiff The Lanigan Group, Inc., as set forth in the PSLRA Certification previously filed June 21, 2022 (Dkt. # 15-3), purchased Peridot shares on February 19-25, 2021, shortly after the Li-Cycle's announcement of the prospective Business Combination. Plaintiff held shares and was eligible to vote at PDAC's extraordinary general meeting on or about August 5, 2021, and obtained Li-Cycle ordinary shares pursuant the Registration Statement and Peridot's Proxy Statement and Prospectus issued in connection with the August 10, 2021 Business Combination.

**Defendants**

21.    Defendant Li-Cycle Holdings Corp. ("Li-Cycle" or the "Company"), formerly known as Peridot Acquisition Corp. ("Peridot") purports to be an industry leader in lithium-ion battery resource recovery and the leading lithium-ion battery recycler in North America. On August 10, 2021, through a series of transactions (the "Business Combination"), Li-Cycle's predecessor entity, Li-Cycle Corp. ("Old Li-Cycle")—organized and existing under the laws of the province of Ontario, Canada—merged into a subsidiary of Peridot, a special purpose acquisition company ("SPAC"), also called a "blank check" company. After the Business Combination, the resulting entity—now Li-Cycle—continued Old Li-Cycle's business operations, and shares of all holders in the predecessor entities (Old Li-Cycle and Peridot) who did not opt out were converted into shares in Li-Cycle.

22.    Li-Cycle is incorporated in Ontario, Canada with its headquarters in Toronto. The Company recycles and recovers lithium-ion battery materials using its facilities in Ontario and New York, and it is currently building and developing its first commercial Hub facility—i.e., a centralized facility for large-scale production of specialty materials—in Rochester, New York.

23.    Shares of the Company have been listed on the New York Stock Exchange ("NYSE") under the ticker symbol "LICY" since August 11, 2021. Prior to the merger, Peridot's ordinary shares traded on the NYSE under the ticker symbol "PDAC."

24.    Defendant Ajay Kochhar ("Kochhar") is a co-founder of Old Li-Cycle, and has served as President, Chief Executive Officer ("CEO"), and a director of the Company since the business Combination on August 10, 2021.

25.    Tim Johnston ("Johnston") is a co-founder of Old Li-Cycle and has served as Executive Chairman and director of the Company since the business Combination on August 10, 2021.

26.     Defendant Bruce MacInnis ("MacInnis") served as the Company's Chief Financial Officer ("CFO") from the Business Combination on August 10, 2021, until his retirement on January 31, 2022.

27.     Defendant Scott Prochazka ("Prochazka") is a member of the Company's Board of Directors and Chair of its Audit Committee.

28.     Defendant Alan Levande ("Levande") has served as a director of the Company since the Business Combination on August 10, 2021. Prior to that, Mr. Levande was Peridot's Chairman and Chief Executive Officer from August 2020 through completion of the Business Combination. He authorized and signed the Proxy Statement and Prospectus.

29.     Defendant Markus Specks ("Specks") served as Chief Financial Officer and Senior Vice President of Corporate Development for Peridot up until the Business Combination on August 10, 2021.

30.     Defendant Preston Powell ("Powell") was a director of Peridot until the Business Combination on August 10, 2021. He reviewed and explicitly or tacitly approved Peridot's Proxy Statement and Prospectus.

31.     Defendant Jonathan Silver ("Silver") was a director of Peridot until the Business Combination on August 10, 2021. He reviewed and explicitly or tacitly approved Peridot's Proxy Statement and Prospectus.

32.     Defendant June Yearwood ("Yearwood") was a director of Peridot until the Business Combination on August 10, 2021. She reviewed and explicitly or tacitly approved Peridot's Proxy Statement and Prospectus.

33.     Defendants Kochhar, Johnston, MacInnis, Prochazka, and Levande are referred to herein as the "Li-Cycle Individual Defendants."

34.    Each of the Li-Cycle Individual Defendants:

(a)    directly participated in the management of the Company;

(b)    was directly involved in the day-to-day operations of the Company at the highest levels;

(c)    was privy to confidential proprietary information concerning the Company and its business and operations;

(d)    was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    was aware of or disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

35.    The Company is liable for the acts of the Li-Cycle Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all the wrongful acts complained of herein were carried out within the scope of their employment.

36.    The Company and the Li-Cycle Individual Defendants are referred to collectively herein as the "Li-Cycle Defendants."

37.    Defendants Levande, Specks, Prochazka, Silver, and Yearwood are referred to collectively herein as the "Peridot Individual Defendants."

38.    Each of the Peridot Individual Defendants:

(a)    directly participated in the management of Peridot;

(b)     was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements contained in the Proxy Statement and Prospectus, as detailed herein;

(c)     negligently permitted these false and misleading statements to be issued concerning the Company and the Business Combination; and/or

(d)     approved or ratified these statements in violation of the federal securities laws.

39.    The Company and the Peridot Individual Defendants are referred to collectively herein as the "Peridot Defendants."

### E.    SUBSTANTIVE ALLEGATIONS

### Background on Li-Cycle

40.    Li-Cycle calls itself "an industry leader in lithium-ion resource recovery and the leading lithium-ion battery recycler in North America." Through its "proprietary 'Spoke & Hub' recycling process", Li-Cycle processes battery manufacturing scrap and end-of-life batteries to produce "black mass," an intermediate product from which rare-earth metals and other materials useful in the manufacture of new batteries can be extracted. Li-Cycle then puts the black mass through a "hydrometallurgical (or 'wet chemistry') process to produce end products, such as lithium carbonate, nickel sulphate and cobalt sulphate, which can be sold back into the battery supply chain and used in the manufacturing of new lithium-ion batteries." Li-Cycle represents that its proprietary "hydrometallurgical" recycling process "enables up to 95% Recycling Efficiency Rate", compared to what it "believes to be a 50% traditional industry average." Li-Cycle further claims that this proprietary process is far more environmentally-friendly than traditional methods, which typically involve extracting black mass by "volatizing or burning" the waste batteries at high temperatures, processes that are "carbon-intensive and generate harmful

emissions." Finally, Li-Cycle says that its recycling process results in "production costs… on average lower than the mining and processing costs otherwise incurred by suppliers to produce these materials," because it is able to "produce multiple materials from a single process" and because the recycling process "yields minimal waste and no displaced earth or tailings", as would extraction by traditional mining methods.

41. Li-Cycle's predecessor, Li-Cycle Corp. ("Old Li-Cycle") was founded in Kingston, Ontario, Canada by Ajay Kochhar and Tim Johnston in 2016, "with the goal of solving the global end-of-life lithium-ion battery disposal problem and creating a secondary supply chain to meet the demand for critical battery materials through innovative recycling technology, ultimately creating a closed-loop supply chain." Old Li-Cycle opened its first pilot facility in Canada in 2017, which had a recycling capacity of 50 tonnes per year. Since 2018, Old Li-Cycle operated a "Spoke and Hub" facility in Kingston, Ontario, Canada. Old Li-Cycle commissioned its first commercial Spoke facility in 2019, which in late 2020 had a total recycling capacity of 5,000 tonnes per year in 2020. Old Li-Cycle opened a second Spoke facility with a recycling capacity of 5,000 tonnes per year, in Rochester, New York in 2020, and in the first quarter of 2021, announced development of an additional Spoke in Arizona, with expected capacity of 5,000 tonnes by late 2022, growing to 10,000 tonnes in 2023.

**Background on Special-Purpose Acquisition Companies ("SPACs") and Peridot Acquisition Corp.**

42. A SPAC is a blank-check company formed for the sole purpose of raising money through a public offering to eventually acquire one or more companies. Peridot Acquisition Corp. ("Peridot"), now known as Li-Cycle Holding Corp. ("Li-Cycle"), was formed as a SPAC for the purpose of finding and acquiring or merging with another business by an affiliate of

Carnelian Energy Capital Management, L.P. ("Carnelian"), and energy-focused private equity firm based in Houston, Texas.

43.    Carnelian incorporated Peridot as a Cayman Islands exempted company on July 31, 2020. In August 2020, Peridot issued 8,650,0000 founder shares to Peridot's subsidiary in exchange for an initial capital contribution of $25,000. Peridot's subsidiary in turn transferred 30,000 shares to each of Defendants Prochazka, and Yearwood[2]. Peridot's subsidiary appointed Defendant Silver to Peridot's Board on September 28, 2020, at which time Peridot's subsidiary also transferred to him 30,000 founder shares.

44.    Peridot's initial public offering of 30,000,000 units for $10.00/unit (the "SPAC IPO"), was made to a registration statement, which was declared effective by the U.S. Securities Exchange Commission ("SEC") on November 23, 2021. The SPAC IPO closed on or about September 24, 2020. Each Peridot unit consisted of one Class A ordinary share of Peridot common stock and one-half warrant—with each whole warrant entitling the holder to purchase one additional Class A ordinary share at an exercise price of $11.50 per share. Peridot's units listed and began trading on the New York Stock Exchange, under the ticker "PDAC:U," on September 24, 2020. The securities subsequently traded separately under the symbols "PDAC" (Class A ordinary shares) and "PDAC:WS" (warrants).

45.    Upon completion of the SPAC IPO, Peridot's officers and directors "commenced an active, targeted search for an initial set of potential business combination targets," specifically targeting "the clean fuel transportation, electrification and energy efficiency, environmental infrastructure, carbon capture, utilization and storage, and the renewables industries…" After

---

[2] Peridot's subsidiary also issued 30,000 shares to Varun Sivaram, who at the time served as an independent director of Peridot. Mr. Sivaram resigned from Peridot's board on January 20, 2021—after Peridot's SPAC IPO but before the Business Combination was announced—at which time Peridot's subsidiary repurchased his 30,000 shares for the nominal sum of $90.

identifying an initial set of "more than 100 potential business combination targets," Peridot evaluated the targets, which included "discussions regarding potential transactions with members of management and/or the boards of directors of certain of these potential acquisition targets" and "exchanged drafts of letters of intent with those targets." "Due to either diligence findings and/or valuation considerations, none of these discussions resulted in an executed letter of intent, other than the discussions with [Old] Li-Cycle."

46.     On December 22, 2020, Defendants Levande and Powell had an initial conversation with Citigroup Global Markets, Inc. ("CGM") to discuss "potential business combination opportunities in general. The following day, December 23, 2020, Levande and Powell has a follow-up conversation with CGM to discuss Old Li-Cycle, which had "recently engaged [CGM] as a strategic advisor." The same day, Peridot and Old Li-Cycle entered a mutual confidential disclosure agreement, and the following day, December 24, 2020, Old Li-Cycle provided Peridot with data room access, in conjunction with an initial draft term sheet for a potential merger. On December 28, 2020, Defendants Levande, Powell, and Sparks held a video conference with Defendants Kochhar and Johnston to discuss a potential deal, and Peridot's officers and board "continued their due diligence throughout the week of December 28, 2020." Peridot and Old Li-Cycle exchanged "multiple revised drafts" of a term sheet between January 1 and January 7, 2021, while Peridot "continued to conduct preliminary business and financial due diligence with respect to [Old] Li-Cycle and its business…" On January 8, 2021, Old Li-Cycle "provided Peridot and its advisors with access to an online data room for purposes of conducting further… due diligence." Peridot's counsel circulated an initial draft of the Business Combination agreement on January 23, 2021, which was finalized and executed on February 15, 2021.

**Li-Cycle's Business Combination with Peridot**

47.    On February 16, 2021, Peridot filed with the SEC a Form 8-K (the "February 15, 2021 8-K"), which attached a joint press release from Peridot and Old Li-Cycle, entitled "Li-Cycle, North America's Largest Lithium-Ion Battery Resource Recycling Company, to List on NYSE through Transaction with Peridot Acquisition Corp." (the "Merger Announcement Press Release"). The Merger Announcement Press Release stated the following about Li-Cycle's business:

> Li-Cycle utilizes a breakthrough, commercial process for sustainably recovering critical high-grade materials from battery manufacturing scrap and end-of-life batteries, creating a closed-loop, domestically sourced lithium-ion battery supply chain. Li-Cycle patented technology enables a shift away from legacy thermal recycling technologies, which can emit harmful emissions and result in lower recovery rates.

48.    The Merger Announcement Press Release listed several "[k]ey investment highlights," including:

> **Robust Customer Network** – Li-Cycle as 40+ commercial contracts with blue chip suppliers and off-take agreements through 2030, corresponding to a cumulative forecasted EBITDA between 2021 and 2025 of $985 million. ***More than $300 million/year of revenue is to be generated from contracted off-take agreements with Traxys [Traxys North America LLC], both an investor in the PIPE and an existing strategic partner***. The Company's commercial battery supply customers include 14 of the largest global automotive and battery manufacturers.

(Emphasis added).

**Li-Cycle's Registration Statement**

49.    Li-Cycle filed its initial Form F-4 Registration Statement on March 30, 2021 (the "Registration Statement"). The Registration Statement also incorporated Li-Cycle's Consolidated Financial Statements and Management's Discussion & Analysis for the year ended October 31, 2020, reporting revenue of CAD $1.059 million, against a prior year reported revenue of CAD $64 thousand, a 1,555%

increase:

**Results of Operations**

*Comparison of Years Ended October 31, 2020 and 2019*

| | Year Ended October 31, | | $ Change | % Change |
|---|---|---|---|---|
| | 2020 | 2019 | | |
| | (dollar amounts in thousands, except share and per share data) | | | |
| Revenues | $    1,059 | $     64 | $    995 | 1,555% |
| Product sales | 740 | 0 | 740 | % |
| Recycling Services | 319 | 64 | 255 | 399% |
| Operating expenses | 13,343 | 5,463 | 7,881 | 144% |
| Professional fees | 3,972 | 726 | 3,245 | 447% |
| Employee salaries and benefits, net | 3,794 | 807 | 2,986 | 370% |
| Depreciation | 1,473 | 244 | 1,228 | 503% |
| Research and development, net | 1,035 | 2,805 | (1,770) | (63)% |
| Raw materials and supplies | 783 | — | 783 | |
| Plant facilities and other | 530 | — | 530 | |
| Marketing | 490 | 87 | 402 | 460% |
| Share-based compensation | 447 | 129 | 318 | 246% |
| Office and administrative | 422 | 472 | (50) | (11)% |
| Travel and entertainment | 215 | 183 | 32 | 17% |
| Freight and shipping | 183 | 8 | 176 | 2,285% |

192

50.    Li-Cycle represented that its consolidated financial statements had been prepared following International Financial Reporting Standards ("IFRS"). It further said that its consolidated financial statements were approved and authorized for issuance by the Company's Board of Directors on March 29, 2021. With respect to revenue recognition, Li-Cycle reported:

*Revenue*

Li-Cycle recognizes revenue from: (i) sales of products, which currently include intermediate products, shredded metal and mixed plastic from Li-Cycle's Spokes; and (ii) providing the service of recycling lithium-ion batteries, which includes coordination of logistics and destruction of batteries. Li-Cycle expects its sales of products to increase as a percentage of overall revenue, as more Spokes and Hubs become operational over time.

For sales of products, revenue is recognized when control of the goods has transferred, meaning when the goods have been shipped to the customer's location (delivery). A receivable is recognized by Li-Cycle when the goods are delivered to the customer as this represents the point in time at which the right to consideration becomes unconditional, as passage of time is the only condition to payment becoming due. The revenue recognized is

based on commodity prices at the time of delivery. Under Li-Cycle's standard contract terms, customers do not have a right of return. Li-Cycle estimates all amounts of consideration to which it expects to be entitled and updates those estimates at the end each reporting period based on market prices. The final settlement amount for the sale of products is typically determined several months after delivery and customer processing of the products, and may result in an adjustment to the previously recognized revenue based on commodity prices on the final settlement date.

Service revenue is recognized upon completion of each service. Prices for services are separately identifiable within each contract. A receivable is recognized by Li-Cycle when the services are completed as this represents the point in time at which the right to consideration becomes unconditional, as passage of time is the only condition to payment becoming due.

51.    In the notes to its consolidated financial statements, Li-Cycle stated with respect to revenue recognition:

16

(q)    *Revenue recognition*

The Company's principal activities generate revenues from the operation of lithium-ion battery recycling plants. The Company uses the following five step approach to revenue recognition:

Step 1: Identify the contract(s) with a customer

Step 2: Identify the performance obligations in the contract

Step 3: Determine the transaction price

Step 4: Allocate the transaction price to the performance obligations in the contract

Step 5: Recognize revenue when (or as) the entity satisfies a performance obligation

The Company recognizes revenue from the following major sources:

• Services of recycling lithium-ion batteries which includes coordination of logistics and destruction of batteries

• Sales of products which includes black mass, shredded metal and plastic

Revenue is measured based on the consideration to which the Company expects to be entitled to in a contract with a customer. The Company recognizes revenue when it transfers control of a product or service to a customer. There are no significant financing components associated with the Company's payment terms.

Service revenue is recognized at a point in time upon completion of the services. Prices for services are separately identifiable within each contract. A receivable is recognized by the Company when the services are completed as this represents the point in time at which the right to consideration becomes unconditional, as only the passage of time is required before payment is due.

For sale of products, revenue is recognized when control of the goods has transferred, being when the goods have been shipped to the customer's location (delivery). A receivable is recognised by the Company when the goods are delivered to the customer as this represents the point in time at which the right to consideration becomes unconditional, as only the passage of time is required before payment is due. Under the Company's standard contract terms, customers do not have a right of return. The Company estimates the amount of consideration to which it expects to be entitled to under provisional pricing arrangements. The amount of consideration for products is based on market prices at the date of settlement, weight and assay, subject to customer confirmation. Revenue and the related accounts

receivables are measured at fair value at initial recognition and are re-estimated by reference to current market prices at each reporting period end and changes in fair value are recognized as an adjustment to profit and loss and the related accounts receivable.

52.    Li-Cycle also noted, in its discussion of "Significant accounting estimates and judgments," that one significant estimate upon which its financial statements relied pertained to "the valuation of inventory with regards to incremental cost to completion for raw materials and determination of net realizable value." With respect to Li-Cycle's valuation in its inventory in FY 2020, the Company reported:

5.    **Inventory**

|  | 2020 $ | 2019 $ |
|---|---|---|
| Raw material | 187,001 | 27,640 |
| Finished goods | 52,703 | 33,628 |
|  | 239,704 | 61,268 |

The cost of inventories recognised as an expense during the year was $1,106,667 (2019: $nil).

The cost of inventories recognised as an expense includes $71,599 for raw materials and $87,507 for finished goods (2019: $nil for raw materials and $nil for finished goods) in respect of write-downs of inventory to net realizable value. There have been no reversal of write-downs for the year ended October 31, 2020 and 2019.

*        *        *

(e) *Inventories*

Raw materials and finished goods are valued at the lower of cost and net realizable value. Cost is determined on a weighted average basis. The cost of finished goods includes the cost of raw materials

and the applicable share of the cost of labour and fixed and variable production overheads. Net realizable value is the estimated selling price less the estimated cost of completion and the estimated costs necessary to make the sale. Costs of idle plant operations are expensed.

At each reporting period, the Company assesses the net realizable value of inventory taking into account current market prices, current economic trends, sales trends and past experiences.

53.    Li-Cycle's statements regarding revenue recognition and valuation of inventory, reflected in the foregoing ¶¶ 51-54, were repeated and reiterated in identical or substantially identical fashion in the Company's four subsequent Form F-4/A Amended Registration Statements, filed on May 13, 2021, June 7, 2021, June 30, 2021, and July 8, 2021.

**Peridot's Proxy Statement and Prospectus**

54.    On July 15, 2021, Peridot filed with the SEC its Proxy Statement and Prospectus for the Business Combination (the "Proxy Statement and Prospectus") pursuant to Rule 424 (b)(3). The Proxy Statement and Prospectus contemplated the merger of Old Li-Cycle into what would become Li-Cycle, with the proposed combined entity referred to as "Amalco." The Proxy Statement and Prospectus incorporated unaudited pro-forma condensed combined financial information for the fictitious "Amalco", purporting to "present the combination of the financial information of Peridot and [Old] Li-Cycle, after giving effect to the [proposed] Business Combination as if it had occurred on November 1, 2019."

55.    The Proxy Statement and Prospectus included a detailed discussion of Old Li-Cycle's business, titled "INFORMATION ABOUT LI-CYCLE". The Proxy Statement and Prospectus described in general terms Old Li-Cycle's business arrangement with Traxys. The Proxy Statement and Prospectus noted that, "[s]ales of Li-Cycle products ***through Traxys*** are expected to represent a significant majority of Li-Cycle's revenues" going forward. (Emphasis added).

**Li-Cycle's Audited and Unaudited Financial Statements Incorporated into the Proxy Statement and Prospectus**

56.     The Proxy Statement and Prospectus also incorporated audited financial statements for Old Li-Cycle for the years ended October 31, 2020 and October 31, 2019, respectively, along with unaudited condensed interim financial statements of Old Li-Cycle as of the three months ended January 31, 2021 and January 31, 2020, respectively.

57.     With respect to recognition of revenue, Old Li-Cycle's incorporated audited financial statements stated:

> For sale of products, revenue is recognized when control of the goods has transferred, being when the goods have been shipped to the customer's location (delivery). A receivable is recognised by the Company when the goods are delivered to the customer as this represents the point in time at which the right to consideration becomes unconditional, as only the passage of time is required before payment is due. Under the Company's standard contract terms, customers do not have a right of return. The Company estimates the amount of consideration to which it expects to be entitled to under provisional pricing arrangements. The amount of consideration for products is based on market prices at the date of settlement, weight and assay, subject to customer confirmation. Revenue and the related accounts receivables are measured at fair value at initial recognition and are re-estimated by reference to current market prices at each reporting period end and changes in fair value are recognized as an adjustment to profit and loss and the related accounts receivable.

58.     With respect to Old Li-Cycle's financial reporting for inventory, the incorporated audited financial statements stated:

> (e)   *Inventories*
>
> Raw materials and finished goods are valued at the lower of cost and net realizable value. Cost is determined on a weighted average basis. The cost of finished goods includes the cost of raw materials and the applicable share of the cost of labour and fixed and variable production overheads. Net realizable value is the estimated selling price less the estimated cost of completion and the estimated costs necessary to make the sale. Costs of idle plant operations are expensed.
>
> At each reporting period, the Company assesses the net realizable value of inventory taking into account current market prices, current economic trends, sales trends and past experiences.

59.     Old Li-Cycle's incorporated audited financial statements included a discussion of its accounting for "Financial instruments," which listed "Trade accounts receivables" as being measured at a "Fair Value, either through Profit or Loss" ("FVTPL") basis, with "Other accounts receivable" being recorded at "Amortized cost." They stated, in relevant part:

> "The classification and measurement of financial assets after initial recognition at fair value depends on the business model for managing the financial asset and the contractual terms of the cash flows. ***Financial assets that are held within a business model whose objective is to collect the contractual cash flows, and that have contractual cash flows that are solely payments of principal and interest***

19

*__on the principal outstanding, are generally measured at amortized cost at each__*
*__subsequent reporting period__*. … All other financial assets are measured at their
fair values at each subsequent reporting period, with any changes recorded
through profit and loss or through other comprehensive income (which
designation is made as an irrevocable election at the time of recognition). After
initial recognition at fair value, financial liabilities are classified and measured at
either: (i) amortized cost; *__(ii) FVTPL, if the Company has made an irrevocable__*
*__election at the time of recognition, or when required (for items such as__*
*__instruments held for trading or derivatives);__* or, (iii) FVTOCI, when the change
in fair market value is attributable to changes in the Company's credit risk.

(Emphases added).

60.    Old Li-Cycle's MD&A also disclosed that it had "identified material weaknesses

in its internal control over financial reporting":

**Internal Control Over Financial Reporting**

Prior to the effectiveness of the registration statement of which this proxy statement/prospectus/consent solicitation statement forms a part, we have been a private company and we have addressed our internal control over financial reporting with internal accounting and financial reporting personnel and other resources.

Li-Cycle has identified material weaknesses in its internal controls over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim consolidated financial statements may not be prevented or detected on a timely basis.

Li-Cycle did not have in place an effective control environment with formal processes and procedures or an adequate number of accounting personnel with the appropriate technical training in, and experience with, IFRS to allow for a detailed review of complex accounting transactions that would identify errors in a timely manner, including inventory costing and business combinations. Li-Cycle did not design or maintain effective controls over the financial statement close and reporting process in order to ensure the accurate and timely preparation of financial statements in accordance with IFRS. In addition, information technology controls, including end user and privileged access rights and appropriate segregation of duties, including for certain users the ability to create and post journal entries, were not designed or operating effectively.

These material weaknesses resulted in misstatements in Li-Cycle's condensed consolidated interim financial statements as of and for the three months ended January 31, 2021 relating to (1) incorrect capitalization of certain amounts that should have been expensed and (2) underaccrual of certain accounts payable. The misstatements have been corrected through the restatement of those financial statements.

61.    The Old Li-Cycle's MD&A regarding material weaknesses in its internal control

referenced the restatement of the amounts incorrectly capitalized and "underaccrual" of "certain

accounts payable". The MD&A did not identify any restatements or errors concerning its

reported revenue, accounts receivable, or inventory.

## Li-Cycle and Peridot Complete the Business Combination

62.    On August 10, 2021, Li-Cycle and Peridot announced that the Business

Combination had been completed. Li-Cycle filed with the SEC the letter of approval for listing

and registration of its securities on the New York Stock Exchange. Peridot's prior ticker symbol

("PDAC") was retired and Li-Cycle's securities began trading under the new ticker symbol "LICY" the same day.

### Li-Cycle's Subsequent Filings and Disclosures

63.    After close of trading on August 11, 2021—just a day after the Business Combination was finalized—the Company filed with the SEC a Form 6-K attaching Li-Cycle's "non-offering prospectus" submitted on August 10, 2021 to the Ontario Securities Commission ("OSC") in connection with the Business Combination the "OSC Prospectus"). The OSC Prospectus attached and incorporated by reference Li-Cycle's unaudited consolidated interim financial statements for the three and six months ended April 30, 2021 (the second quarter and first half of FY 2021) (the "2Q21 interim financial statements"). The notes to the 2Q21 interim financial statements included new language in its discussion of Li-Cycle's significant accounting policies, specifically with regard to accounts receivable:

**3.   Accounts receivable**

|  | April 30, 2021 $ | October 31, 2020 $ |
|---|---|---|
| Trade receivables | 1,470,119 | 571,300 |
| Harmonized Sales Taxes receivable | 281,486 | 274,998 |
| Other receivables | — | 43,931 |
|  | 1,751,605 | 890,229 |

For product sales, the Company estimates the amount of consideration to which it expects to be entitled under provisional pricing arrangements. The amount of consideration for black mass and mixed copper/aluminum sales is based on the mathematical product of: (i) market prices of the constituent metals at the date of settlement, (ii) product weight, and (iii) assay results (ratio of the constituent metals initially estimated by management and subsequently trued up to customer confirmation). Certain adjustments like handling and refining charges are also made per contractual terms with customers. Depending on the contractual terms with customers, the payment of receivables may take up to 12 months from date of shipment. Product sales and the related trade accounts receivables are measured at fair value at initial recognition and are re-estimated at each reporting period end using the market prices of the constituent metals at the respective measurement dates. Changes in fair value are recognized as an adjustment to profit and loss and the related accounts receivable. For the three months ended April 30, 2021, the fair value loss arising from changes in estimates was $107,535. For the six months ended April 30, 2021, the fair value gain arising from changes in estimates was $167,982 (three and six months ended April 30, 2020: Nil).

An insignificant portion of the receivables relate to services revenue which are initially measured at fair value and subsequently at amortized cost. For the period ended April 30, 2021 and 2020, the Company has assessed an allowance for credit loss of $nil for service-related receivables based on its past experience, the credit ratings of its existing customers and economic trends.

64.    On September 9, 2021, the Company filed with the SEC a Form 6-K report attaching its condensed consolidated interim financial statements for the three and nine months ending July 31, 2021 (the "3Q21 interim financial statements"). The Company reported revenue

for the period of $2.983 million, nearly ten times the total revenue of $325,033 reported for the same period in FY 2020. The 3Q21 interim financial statements included the following similar discussion regarding the Company's reported accounts receivable:

**3. Accounts receivable**

| | July 31, 2021 $ | October 31, 2020 $ |
|---|---|---|
| Trade receivables | 2,877,970 | 571,300 |
| Harmonized Sales Taxes receivable | 378,011 | 274,998 |
| Other receivables | — | 43,931 |
| | 3,255,981 | 890,229 |

For product sales, the Company estimates the amount of consideration to which it expects to be entitled under provisional pricing arrangements. The amount of consideration for black mass and mixed copper/aluminum sales is based on the mathematical product of: (i) market prices of the constituent metals at the date of settlement, (ii) product weight, and (iii) assay results (ratio of the constituent metals initially estimated by management and subsequently trued up to customer confirmation). Certain adjustments like handling and refining charges are also made per contractual terms with customers. Depending on the contractual terms with customers, the payment of receivables may take up to 12 months from date of shipment. Product sales and the related trade accounts receivables are measured at fair value at initial recognition and are re-estimated at each reporting period end using the market prices of the constituent metals at the respective measurement dates. Changes in fair value are recognized as an adjustment to profit and loss and the related accounts receivable. For the three and nine months ended July 31, 2021, the fair value gain arising from changes in estimates was $361,141 and $529,109, respectively (three and nine months ended July 31, 2020: Nil).

An insignificant portion of the receivables relate to services revenue which are initially measured at fair value and subsequently at amortized cost. For the period ended July 31, 2021 and 2020, the Company has assessed an allowance for credit loss of $nil for service-related receivables based on its past experience, the credit ratings of its existing customers and economic trends.

65.     Li-Cycle's 3Q21 interim financial statements also included a "summary of the Company's main customers, reflecting that 89% of Li-Cycle's revenue and 71% of its reported accounts receivable for the nine months ending July 31, 2021, were attributable to just two unidentified "customers":

The following is a summary of the Company's main customers:

| | Three months ended July 31, | | Nine months ended July 31, | |
|---|---|---|---|---|
| | 2021 % | 2020 % | 2021 % | 2020 % |
| **Revenue** | | | | |
| Customer A | 44% | 59% | 61% | 57% |
| Customer B | 49% | 0% | 28% | 0% |
| **Accounts Receivable** | | | | |
| Customer A | | | 47% | 58% |
| Customer B | | | 24% | 0% |

66.     On January 31, 2022, the Company filed with the SEC on Form 20-F its first annual report for the fiscal year ended October 31, 2021 ("FY21 Annual Report"), which was signed by Defendant Kochhar. The financial statements of the Company were attached as an exhibit to the FY21 Annual Report, which stated in pertinent part:

| | Notes | Year ended October 31, | |
|---|---|---|---|
| | | **2021** $ | 2020 $ |
| **Revenue** | | | |
| Product sales | | 6,930,475 | 554,914 |
| Recycling services | | 444,401 | 237,340 |
| | | 7,374,876 | 792,254 |
| **Expenses** | | | |
| Employee salaries and benefits, net | | 12,709,823 | 2,819,195 |
| Professional fees | | 7,688,520 | 2,962,261 |
| Share-based compensation | 12 | 3,982,943 | 327,634 |
| Raw materials and supplies | | 3,410,014 | 591,881 |
| Office, administrative and travel | | 3,148,871 | 476,733 |
| Depreciation | 7,14 | 2,899,345 | 1,095,250 |
| Research and development, net | | 2,662,572 | 776,668 |
| Freight and shipping | | 1,033,149 | 137,010 |
| Plant facilities | | 1,030,947 | 559,587 |
| Marketing | | 973,695 | 365,820 |
| Change in Finished Goods Inventory | | (307,817) | (14,022) |
| | | 39,232,062 | 9,934,117 |

67.    Also attached to the FY21 Annual Report was the management's discussion and analysis of financial condition and results of operations, which stated the following about the Company's revenue recognition:

Li-Cycle recognizes revenue from: (i) sales of products, which currently include three intermediate products, being black mass, mixed copper/aluminum and mixed plastics from Li-Cycle's Spokes; and (ii) providing the service of recycling lithium-ion batteries, which includes coordination of logistics and destruction of batteries. We expect Li-Cycle's sales of products to increase as a percentage of overall revenue as more Spokes and Hubs become operational over time. Li-Cycle expects to recognize revenue from sales of end products, including nickel sulphate, cobalt sulphate and lithium carbonate, after its first Hub becomes operational.

For product sales, revenue is recognized when control of the goods has transferred, meaning when the goods have been shipped to the customer's location (delivery). *A receivable is recognized by Li-Cycle when the goods are delivered to the customer*, as this represents the point in time at which the right to consideration becomes unconditional, as passage of time is the only condition to payment becoming due.

(Emphasis added).

68.     In its discussion of Critical Accounting Policies and Estimates, Li-Cycle's management also stated: "Given the significance of revenue and the level of judgment in the provisional pricing, *revenue recognition is considered a critical accounting policy*." (emphasis added).

69.     Also in is discussion of Critical Accounting Policies and Estimates, management said the following regarding its accounting for inventory:

*(e) Inventories*

Raw materials and finished goods are valued at the lower of cost and net realizable value. Cost is determined on a weighted average basis. The cost of finished goods includes the cost of raw materials and the applicable share of the cost of labour and fixed and variable production overheads. Net realizable value is the estimated selling price less the estimated cost of completion and the estimated costs necessary to make the sale. Costs of idle plant operations are expensed.

At each reporting period, the Company assesses the net realizable value of inventory taking into account current market prices, current economic trends, sales trends and past experiences.

70.     The FY21 Annual Report also reported that "Li-Cycle [had] identified material weaknesses in its internal control over financial reporting," including in areas such as "revenue recognition, inventory, related-party arrangements, financing transactions and business combination transactions," that Li-Cycle lacked "an effective control environment" and an "adequate number of accounting personnel with appropriate technical training in, and experience with

IFRS…":

*Li-Cycle has identified material weaknesses in its internal control over financial reporting. If its remediation of such material weaknesses is not effective, or if it fails to develop and maintain a proper and effective internal control over financial reporting, its ability to produce timely and accurate financial statements or comply with applicable laws and regulations could be impaired.*

Prior to August 10, 2021, Li-Cycle Holdings Corp. was a private company and we addressed our internal control over financial reporting with internal accounting and financial reporting personnel and other resources.

In the course of preparing for the Business Combination with Peridot Acquisition Corp., Li-Cycle identified material weaknesses in its internal controls over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of Li-Cycle's annual or interim consolidated financial statements may not be prevented or detected on a timely basis.

Li-Cycle did not have in place i) an effective control environment with formal processes and procedures and ii) an adequate number of accounting personnel with the appropriate technical training in, and experience with, IFRS to allow for a detailed review of complex accounting transactions, that would identify errors in a timely manner, including in areas such as revenue recognition, inventory, related party arrangements, financing transactions and business combination transactions. Li-Cycle did not design or maintain effective controls over the financial statement close and reporting process in order to ensure the accurate and timely preparation of financial statements in accordance with IFRS. In addition, information technology controls, including end user and privileged access rights and appropriate segregation of duties, including for certain users the ability to create and post journal entries, were not designed or operating effectively.

71.     Li-Cycle's FY21 Annual Report Management's Report on Internal Controls over Financial Reporting stated that, "[w]e have taken steps to address these material weaknesses and expect to continue to implement the remediation plan…" However, management also noted that, "[a]lthough we have made enhancements to our control procedures in this area, the material weaknesses will not be remediated until the necessary controls have been implemented and are operating effectively." Finally, management noted that "there were no changes in our internal control over financial reporting that have materially affected or are reasonably likely to materially affect our internal control over financial reporting."

72.     On February 16, 2022, Li-Cycle filed two versions of its "Post-Effective Amendment No. 1" to the Registration Statement, incorporating its FY21 Annual report and management's discussion and analysis, as related in ¶¶ 67-72, above. The Post-Effective Amendment clarified that, "The Registration Statement, as amended by this Post-Effective Amendment No. 1, relates solely to the registration of 11,021,923 of our common shares issuable by the Registrant upon conversion of an outstanding unsecured convertible note issued to the selling shareholder named in this prospectus."

73.     On March 17, 2022, the Company filed with the SEC a Form 6-K (the "March 17, 2022 Form 6-K"), which was signed by Defendant Kochhar. The March 17, 2022 Form 6-K attached a press release entitled "Li-Cycle Reports First Quarter 2022 Financial Results; Significant Milestone Achieved for Rochester Hub Project" (Q1 2022 Financial Results Announcement). The Q1 2022 Financial Results Announcement stated that "[r]evenues for the quarter ended January 31, 2022 increased 277% to $3.8 million, compared to $1.0 million in the same quarter last year."

74. The Q1 2022 Financial Results Announcement reported the following financial statements:

| | Three months ended January 31, | |
| --- | --- | --- |
| | 2022 | 2021 |
| | $ | $ |
| **Revenue** | | |
| Product sales | 3,622,447 | 912,866 |
| Recycling services | 215,523 | 104,374 |
| | 3,837,970 | 1,017,240 |
| **Expenses** | | |
| Employee salaries and benefits | 7,778,660 | 1,698,199 |
| Professional fees | 2,874,039 | 2,434,134 |
| Share-based compensation | 5,198,809 | 746,171 |
| Raw materials and supplies | 1,413,842 | 414,102 |
| Office, administrative and travel | 2,844,540 | 304,241 |
| Depreciation | 1,834,075 | 527,378 |
| Research and development | 341,786 | 527,195 |
| Freight and shipping | 210,361 | 291,050 |
| Plant facilities | 437,070 | 214,134 |
| Marketing | 448,945 | 141,655 |
| Change in Finished Goods Inventory | (811,434) | (77,632) |
| | 22,570,693 | 7,220,627 |
| Loss from operations | (18,732,723) | (6,203,387) |
| **Other (income) expense** | | |
| Fair value (gain) loss on financial instruments | (50,871,565) | – |
| Interest expense | 3,741,242 | 250,689 |
| Foreign exchange (gain) loss | (11,453) | 391,964 |
| Interest income | (137,587) | (717) |
| | (47,279,363) | 641,936 |
| Net profit (loss) and comprehensive income (loss) | 28,546,640 | (6,845,323) |
| Earnings (loss) per common share - basic | 0.17 | (0.07) |
| Earnings (loss) per common share - diluted | 0.17 | (0.07) |

75. The March 17, 2022 Form 6-K also attached the Company's consolidated interim financial statements for the period ended January 31, 2022, which reported the following accounts receivable:

**Accounts receivable**

| | January 31, 2022 | October 31, 2021 |
| --- | --- | --- |
| | $ | $ |
| Trade Receivables | 5,815,394 | 4,072,701 |
| Total accounts receivable | 5,815,394 | 4,072,701 |
| Harmonized Sales Taxes receivable | 710,824 | 379,814 |
| Other | – | 593,331 |
| Total other receivables | 710,824 | 973,145 |

For product sales, the Company estimates the amount of consideration to which it expects to be entitled under provisional pricing arrangements. For the three months ended January 31, 2022, the fair value gain arising from changes in estimates was $1,738,469 (three months ended January 31, 2021: $275,503) included in the respective accounts receivable balance.

An insignificant portion of the receivables relate to services revenue which is initially measured at fair value and subsequently at amortized cost. For the three months ended January 31, 2022 and October 31, 2021, the Company has assessed an allowance for credit loss of $nil for service-related receivables based on its past experience, the credit ratings of its existing customers and economic trends.

76.     The statements referenced in ¶¶48-76 were false and materially misleading, because Defendants made false and/or misleading statements and/or failed to disclose that: (1) Li-Cycle's putative largest customer, Traxys, is not actually a customer, but merely a broker providing working capital financing to the Company while Traxys tries to sell Li-Cycle's product to end customers; (2) the Company's mark-to-model accounting is vulnerable to abuse and gave a false impression of growth; (3) a significant portion of the Company's reported revenues were derived from simply marking up receivables on products that had not yet been sold; and (4) as a result, Defendants' public statements were materially false and/or misleading at all relevant times.

**Blue Orca Reveals the Truth of Li-Cycle's False and Misleading Accounting to the Market**

77.     On March 24, 2022, before market hours, researcher Blue Orca Capital released a report on Li-Cycle (the "Report"), which described the Company as "a near fatal combination of stock promotion, laughable governance, a broken business hemorrhaging cash, and highly questionable Enron-like accounting." Among other things, the Report alleged that the Company's revenues are based on "an Enron-like mark-to-model accounting gimmick," that was vulnerable to abuse and gave a false impression of growth. The Report alleged, in pertinent part:

> In our opinion, Li-Cycle's accounting is reminiscent of Enron – as a significant portion of the Company's revenues are not derived from bona fide sales of recycled product to end customers, but rather Li-Cycle's provisional estimates of the value of such product delivered to its brokers.
>
> Li-Cycle's largest customer, and the foundation for its future revenue projections, is Traxys North America LLC ("Traxys") – a large commodities trader that is also an investor in Li-Cycle. The contract with Traxys accounts for not only the majority of Li-Cycle's revenues, but also a substantial portion of Li-Cycle's revenue projections to investors. Yet analyzing the details of the contract, it becomes evident that Traxys is not really a customer, but merely a broker providing working capital financing to the Company while Traxys attempts to sell Li-Cycle's product to end customers. Traxys is not the end customer, it bears no commodity price risk, and charges Li-Cycle interest on any cash advanced to the

Company prior to final sale to the end buyer. Yet Li-Cycle somehow recognizes revenue immediately upon delivery to its brokers, potentially months before any sale has occurred.

The Company's revenue is based on its provisional estimate of the value of the black mass delivered to its investor/broker, not the price ultimately paid for the product by the end customer. Li-Cycle in effect uses mark-to-model accounting, pulling sales forward from future periods and recognizing revenues based on its own self-serving estimates. But that is not all, as this mark-to-model accounting framework allows the Company to juice its revenues with non-cash gains on previously recognized revenues.

We calculate that **<u>45% of Li-Cycle's reported revenues</u>** in the last quarter were derived from simply marking up receivables on products that had not been sold.

*     *     *

***Under Li-Cycle's bizarre mark-to-model accounting framework, it appears that Li-Cycle books these gains straight into their current period revenue, boosting its top line with unrealized gains on prior transactions. We question whether this highly aggressive accounting caused <u>Li-Cycle's auditor and CFO to resign</u>, both of whom abruptly left the Company following the end of the last fiscal year.***

(Emphasis added).

78.     The Report further alleged that the Company's largest customer, Traxys, is not actually a customer, stating in pertinent part:

Li-Cycle reports sales of black mass to Traxys, with revenue recognized upon delivery of the product to Traxys. This seems, at first glance, to be a standard customer relationship with a commodity producer. But dig deeper and any semblance of normalcy unravels.

*     *     *

First, it is critical to note that Traxys is **actually not the end customer**, but a broker or marketing partner that on-sells Li-Cycle's black mass to end buyers. Despite recognizing revenue on sales to Traxys, Li-Cycle is actually selling **<u>through</u>** Traxys, not to it.

*     *     *

Not only is Traxys not the end buyer, but the revenue recognized by Li-Cycle is merely Li-Cycle's **<u>initial estimate</u>** of the price of the product it expects to receive

28

from the end customer once the final deal is complete. Once Traxys sells the goods to an end customer, it passes through this revenue, **_minus costs and a marketing fee_**, to Li-Cycle.

*       *       *

Traxys is a commodity broker, taking a marketing fee (e.g., a commission) on the sale of product from Li-Cycle to an end customer. Yet Li-Cycle recognizes revenue not when the final consideration is paid and the goods are received by the end customer, but upon delivery to Traxys, its broker.

While Traxys is attempting to sell the product, although it takes title to the goods and assumes collection risk, Traxys assumes virtually none of the other risk associated with selling the black mass – leaving Li-Cycle financially accountable for (1) commodity price changes, (2) damage or loss, (3) timing and interest rate risk, (4) insurance, and (5) non-compliant goods.

79.    The Report further explained how Li-Cycle's financials are contingent on this mark-to-model accounting model:

Not only do we believe that it is inappropriate to recognize revenue on the initial delivery of goods to the Company's broker, but the provisional nature of the initial price estimate is ripe for abuse and reminiscent of Enron's mark-to-model accounting.

There are two problems with Li-Cycle's financial statements. **_First, they pull forward future sales that have not been completed into the current period, giving an impression of growth even though no end customer has purchased the product._**

**_The second problem is that Li-Cycle recognizes revenue based on its provisional estimate of the value of the commodities, not the final sales price to an end customer. If the final consideration paid by the end customer differs from Li-Cycle's estimate, rather than recognizing the differences as other income, Li-Cycle simply makes a balance sheet adjustment to its accounts receivable and juices its revenue._** This gives Li-Cycle considerable discretion over its revenues, including the discretion to increase revenues by marking up receivables on unsold black mass already delivered to its brokers and recognized as revenues in prior periods.

(Emphasis added).

80.    The Report claimed that "Li-Cycle's bizarre mark-to-model accounting framework allows the Company to juice its revenues with non-cash gains by upwardly revising previously recognized revenues in the current period." The Report states, in pertinent part:

> Although Li-Cycle recognizes revenue immediately upon delivery of goods to its broker, it only receives part of the estimated consideration initially as an interest-bearing loan from Traxys. Li-Cycle categorizes the rest of the estimated consideration as a receivable.
>
> These receivables have ballooned, with the balance of receivables equal to 134% of revenues as of Q1 FY22.
>
> \*                    \*                    \*
>
> Although Li-Cycle recognizes revenue immediately upon delivery of goods to its broker, it only receives part of the estimated consideration initially as an interest-bearing loan from Traxys. Li-Cycle categorizes the rest of the estimated consideration as a receivable.
>
> These receivables have ballooned, with the balance of receivables equal to **134%** of revenues as of Q1 FY22.
>
> \*                    \*                    \*
>
> Notably, Li-Cycle also recognizes non-cash gains on the **upward revision on the value of its receivables**, on the basis that Li-Cycle has increased its estimate of the value of product not yet sold to end customers.
>
> \*                    \*                    \*
>
> Normally, we would expect a non-cash gain from a revision on an asset to show up on the income statement below the line as 'other income.' But curiously, Li-Cycle reports no such line item. Indeed, of all the line items reported on income statement, the only one where a $1.7 million gain could fit is in **revenues**.
>
> \*                    \*                    \*
>
> Li-Cycle has some discretion to determine the value of its own revenues, given the provisional nature of the initial price estimate. According to the footnotes in its financial statements, it has been recognizing gains on accounts receivable by upwardly revising such estimates on unsold product. ***By elimination, we believe that such gains are actually being appended to Li-Cycle's top line revenues, which if true, would be absurd, especially considering that these gains accounted for 45% of reported total revenue in Q1 FY22***. (Emphasis added).

30

81.    The Report further alleged that Li-Cycle is able to "obscure its financial health" by hiding negative gross margins on its income statements, thereby "omitting costs of goods sold and including most costs under a nebulous expense category." The Report states, in pertinent part:

> Presented in this format, Li-Cycle seems to imply healthy gross margins. For example, in FY21, Li-Cycle reported raw materials and supply expenses of $3.1 million. When compared to its revenues of $7 million, this seems to imply an impressive gross margin of 55% in FY21. In the latest quarter, the Company's implied gross margin grew to 83%.

> \*                    \*                    \*

> However, the footnotes to its financial statements, Li-Cycle reports that its cost of inventories recognized as expenses were $8.55 million in FY21. These inventory expenses exceeded reported revenues that year and were well above the amount that the Company reported on its income statement as raw material and supply expenses in FY 21.

> \*                    \*                    \*

> *If we consider these expenses buried in the footnotes, we calculate that Li-Cycle's gross margins were -48% in FY20 and -23% in FY21. If we aggregate the Company's financials since FY 2020 (effectively inception), Li-Cycle's costs of inventories have exceeded revenues, indicating that its gross margins on battery recycling are likely negative*.

> \*                    \*                    \*

> Not only do negative margins contradict the Company's disclosures in its SPAC presentations regarding the profitability of its business but suggest that Li-Cycle's business is neither scalable nor economically viable. *Yet because of the way Li-Cycle obfuscates its income statement, this is hidden from investors who may be forgiven for ignoring key disclosures buried in the footnotes.*

> \*                    \*                    \*

> *By not reporting a proper income statement, we think that Li-Cycle gives investors the misleading impression that at least its business is profitable on a gross basis.* But based on our read of the footnotes, we think that Li-Cycle's gross margins are likely **negative**, indicating that Li-Cycle's recycling business is neither scalable nor economically viable.

(Emphasis added).

### Li-Cycle's "Off-Take" Arrangements with Glencore and Traxys

82.    The Registration Statement and the Proxy Statement and Prospectus reported that at the time of the Business Combination, Li-Cycle was party to an "off-take" agreement with Glencore, an Anglo-Swiss multinational commodity trading and mining company, related to the sale of black mass produced by Li-Cycle. Under the Glencore "off-take" agreement, Li-Cycle was paid by Glencore "in accordance with commodity pricing at the time of sale, subject to discounts for additional refinements" to isolate valuable rare-earth minerals from Li-Cycle's black mass. Li-Cycle disclosed that product sales to Glencore represented "a significant majority" of its reported revenues in FY 2020—approximately 70%. Additionally, Li-Cycle reported that it sold "other intermediate products," including "mixed copper/aluminum and plastics" to Glencore, and that under the terms of its agreements, Li-Cycle was entitled to receive "an agreed percentage of the contained metal content, at referenced commodity prices… less applicable treatment and refining charges."

83.    Li-Cycle also reported what it called a "strategic global partnership" with Traxys, a company that "provides financial and logistics solutions to the metals, mining, and energy industries." Li -Cycle and Traxys were party to two "Marketing, Logistics, and Working Capital Agreements," which, according to the Proxy Statement and Prospectus, covered 100% of Li-Cycle's production of black mass, "until such time as this material is integrated by Li-Cycle into the supply chain…" and 100% of Li-Cycle's production of "certain end products", including "lithium carbonate, cobalt sulphate[,] nickel sulphate, manganese carbonate and graphite concentrate." At the time of the Business Combination, the agreement "remain[ed] subject the completion of certain outstanding fixed-volume sales commitments to a third-party purchasers."

Li-Cycle also noted that Traxys "may earn marketing fees under these agreements, based on the final sales price of products sold by Traxys to its third-party customers," as well as "interest on provisional payments made from Traxys to Li-Cycle." The Proxy Statement noted that "[s]ales of Li-Cycle products through Traxys [were] expected to represent the significant majority of Li-Cycle's revenues" in subsequent periods.

84.     On May 13, 2021, Li-Cycle attached partially-redacted versions of two agreements with Traxys as attachments Nos. 10 and 12 with Amendment No. 1 to its Form F-4 Registration Statement. The first, dated September 24, 2020, pertained to refined products (namely, cobalt sulfate, lithium carbonate, manganese carbonate, and graphite concentrate) to be produced by Li-Cycle's Hub 1 facility in Rochester, NY. The second, also dated September 24, 2020, pertained to black mass produced from Li-Cycle's Spoke 1 and Spoke 2 facilities, in Kingston, Ontario, and Rochester, New York, respectively. We refer to these documents collectively herein, as the "Traxys Off-Take Agreements."

85.     The Traxys Off-Take Agreements, by their terms, deem Traxys the "buyer" of 100% of the covered materials to be produced by Li-Cycle's Kingston and Rochester facilities. They provide that Traxys "shall be the off-taker and pay and take title to the Material as principal and sell to third party final buyers as principal, " and that "[t]he payment and collections risk shall remain with Traxys."

86.     However, from the substantive terms of the Traxys Off-Take Agreements, it is clear that Traxys actually acted as a broker, marketing partner, and lender (extending initial payments for materials Li-Cycle produced under a "Working Capital Facility", for which Li-Cycle was obligated to pay interest until such time as sale to third-party purchases were finalized and payment collected by Traxys.)

87.     This understanding was reinforced on January 31, 2022, when post-Business Combination Li-Cycle filed its first annual report with the SEC on Form 20-F (the "FY21 Annual Report"). The FY21 Annual Report attached (as Exhibits 11-13 thereto) amended and restated versions of both Traxys Off-Take Agreements, dated December 15, 2021, together with a letter from Traxys, dated the same day, "Re: Services for Additional Hubs and Additional Hub Materials". The letter contemplates Li-Cycle's extension of its arrangements with Traxys to cover any additional hub facilities Li-Cycle might develop, and provides that Li-Cycle would, upon commissioning such new facilities, notify Traxys in writing via a notice that would specify, "Li-Cycle's and its affiliates' anticipated requirements for marketing, logistics and/or working capital services (the '**Subject Services**'), as applicable, with respect to the Additional hub," upon which the parties would negotiate in good faith for Traxys to, "provide the Subject Services in respect to the Additional Hub Material for the Additional Hub in substantially the same manner, and on substantially the same terms and conditions, as set forth in" the existing Traxys Off-take Agreements. (Emphasis in original).

88.     The December 15, 2021 letter clarifies the actual nature of Li-Cycle's arrangement with Traxys—as a service provider, rendering "marketing, logistics, and working capital services" to Li-Cycle. Traxys would broker deals with third-party buyers (referred to in the Traxys Off-Take Agreements as "customers") and handle logistics, shipping, and collections.

89.     Traxys would receive a percentage of the sale price of Li-Cycle's materials to its third-party customers, together with a percentage "marketing fee", and would be entitled to reimbursement by Li-Cycle for all of its "Transaction Costs": transportation costs (including freight, charter hire, and costs related to chartered vessels), port costs for loading and discharge, costs of inspection and testing of the product, costs of insurance, taxes, duties, and other sums

levied (including freight), and all "losses, claims, damages or expenses incurred or paid to third parties" in connection with the transportation or sale of the product (including legal expenses), hedging costs, finance charges, and "any other relevant costs and expenses attributable to the sale" of Li-Cycle's product.

90.     Traxys also provided Li-Cycle with "continuous transactional financing" in the form of a Working Capital Facility, from which Traxys would disburse an up-front loan (the "provisional price", set at approximately 75% of the expected price to the ultimate customer) for material released by Li-Cycle, until payment was collected from the final customer. The agreements would then call for a second provisional payment (if at any time the expected final sale price differed by +/- 10% from the initial provisional payment date), to ***or from*** Li-Cycle, and then a third and final payment to ***or from*** Li-Cycle "upon all final details known."

91.     Although Li-Cycle records its revenue when the product is delivered to Traxys, this revenue is merely an ***estimation*** of the consideration Li-Cycle may receive upon the final sale of the product, contingent on commodity price movements and the results of testing assays run on the black mass by the end customer.

92.     So, if the purchase price is appreciably lower than the initial estimated price—or even uncollectible—Li-Cycle is on the hook to reimburse Traxys. Thus, the "payment collections and credit risk" do not, materially, transfer to Traxys. Rather, these risks "remain with" Li-Cycle.

93.     The Agreements provide that the Working Capital Facility "will be interest bearing for the Seller"—the "Seller" in this document being defined as Li-Cycle. Thus, by their terms, the Agreements would appear to obligate Traxys to pay interest ***to Li-Cycle***. The rate of interest is set at LIBOR plus a redacted percentage, which "shall be adjusted from time to time in

line with Traxys' cost of capital." This type of provision appears designed to protect the lender by permitting it to pass increases in its capital cost through to the borrower.

94.     Li-Cycle's disclosures in its FY21 Annual Report clarify that the payments of interest in fact flowed from Li-Cycle to Traxys. In Li-Cycle's discussion of "Our Commercial Contracts," it clearly states that "Traxys earns marketing fees under the agreement, based on the final sales price of the black mass sold by Traxys to its third-party customers, ___as well as interest on provisional payments made from Traxys to Li-Cycle."___



| Battery Sources | FY2021A |
|---|---|
| Manufacturing Scrap | 27% |
| Transportation – inclusive of damaged, defective and recalled lithium-ion batteries | 54% |
| Energy Storage Systems | 3% |
| Consumer Electronics | 16% |
| Total | 100% |

i.     Measured by weight of battery materials

*Black Mass Offtake Agreement with Traxys*
        Li-Cycle has entered into a strategic global marketing relationship with Traxys, a company that provides financial and logistics solutions to the metals, mining and energy industries. As part of this relationship, Li-Cycle has entered into a Black Mass Marketing, Logistics and Working Capital Agreement with Traxys, covering 100% of its production of black mass, until such time as this material is integrated by Li-Cycle into the supply chain for Li-Cycle's Hubs. Traxys earns marketing fees under the agreement, based on the final sales price of the black mass sold by Traxys to its third-party customers, as well as interest on provisional payments made from Traxys to Li-Cycle. Prices are based on index pricing for the nickel and cobalt contained in the black mass.

*Refined Products Offtake Agreement with Traxys*
        Li-Cycle has also entered into a Refined Products Marketing, Logistics and Working Capital Agreement with Traxys, covering 100% of its production of certain end products from the Rochester Hub, consisting of nickel sulphate, cobalt sulphate, lithium carbonate, manganese carbonate and graphite concentrate. The Hub products agreement extends for a term expiring seven years after the achievement of certain commercial production milestones at the Rochester Hub, and is therefore expected to extend to 2030. Traxys earns marketing fees under the agreement, based on the final sales price of the black mass sold by Traxys to its third-party customers, as well as interest on provisional payments made from Traxys to Li-Cycle. Prices are based on index pricing for the relevant products, adjusted for the product form (e.g., adjusted to reflect the pricing for the premium battery grade nickel sulphate form, relative to the relevant index pricing which is for nickel metal). Commercial terms between Traxys and third-party customers are arranged in advance, transparent to Li-Cycle and based on the commodity prices for the metals contained in the Li-Cycle products.

95.     Thus, it appears from the errors on their face that the Traxys Off-Take Agreements were modified by the parties to permit Li-Cycle to assert that Traxys was a buyer—rather than a marketing and logistics service provider—and to recognize revenue upon receipt of payments from Traxys under the Working Capital Facility.

96.     While Li-Cycle characterized Traxys as a "buyer," the Traxys Off-Take Agreements are not by their terms characterized as purchase contracts—rather, each is titled a "Marketing, Logistics, and Working Capital Agreement".

97.     In truth, Traxys is simply a service provider, taking a marketing fee (e.g., a commission) on the sale of product from Li-Cycle to an end customer. Yet Li-Cycle recognizes revenue not when the final consideration is paid and the goods are received by the end customer, but upon delivery to Traxys. While Traxys tries to sell the product, although it ostensibly takes

title to the goods and assumes collection risk, Traxys assumes virtually none of the other risk associated with selling the black mass – leaving Li-Cycle financially accountable for (1) commodity price changes, (2) damage or loss, (3) timing and interest rate risk, (4) insurance, and (5) non-compliant goods.

98.    In short, Traxys is not the end customer, bears no commodity price risk with respect to the product, and receives what it describes as a marketing fee upon final sale of the product to the actual end customer. Yet Li-Cycle recognizes revenues immediately upon delivery of the black mass to Traxys, even though the sale of the product to an end customer may not take place for months and the final consideration may vary substantially from the price provisionally estimated.

99.    In economic substance, Li-Cycle continued to bear responsibility for all material costs and risk of loss in connection the sale and transportation of the product until final payment from the final customer was collected by Traxys. It paid interest to Traxys on the "provisional payments" under the Working Capital Facility and the funds received as "provisional payments" remained subject to repayment to Traxys if the expected final sale price dropped below the parties' initial estimate.

**Li-Cycle's Financial Statements and Related Disclosures Violated International Financial Reporting Standards ("IFRS") and Were Materially Misleading**

100.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

101.    Accounting standards are a set of principles companies must follow when they prepare and publish their financial statements, providing a standardized way of describing the company's financial position and performance. The International Financial Reporting Standards

("IFRS") are set by the International Accounting Standards Board ("IASB"), which is a standard-setting body of the IFRS Foundation, a not-for-profit, public interest organization established to develop a single set of high-quality, understandable, enforceable and globally-accepted accounting standards and to promote and facilitate adoption of those standards.

102.    In 2007, the SEC approved a measure allowing foreign registrants like Li-Cycle to use financial statements prepared in accordance with IFRS without providing a reconciliation to the U.S. Generally Accepted Accounting Principles ("GAAP").

103.    Li-Cycle stated in the Registration Statement that it prepared and presented its financial statements in conformity with IFRS:

> *Li-Cycle's consolidated financial statements have been prepared in accordance with IFRS. All amounts are in Canadian dollars except as otherwise indicated…*

***

> *These consolidated financial statements have been prepared in accordance with International Financial Reporting Standards ("IFRS") as issued by the International Accounting Standards Board ("IASB") incorporating interpretations issued by the IFRS Interpretations Committee ("IFRICs").*

104.    The *Conceptual Framework for Financial Reporting* ("*Conceptual Framework*") sets out fundamental concepts for financial reporting that guide IASB in developing IFRS standards. It was issued by the IASB in September 2010.[3] The *Conceptual Framework* describes the objective of, and the concepts for, general purpose financial reporting. The *Conceptual Framework's* purpose is, among other things, to (a) assist the IASB in the review of existing and development of future IFRSs; (b) assist preparers of financial statements in applying IFRSs and in dealing with topics that have yet to form the subject of an IFRS; and (c) assist users of

---

[3] The *Conceptual Framework* was subsequently revised in March 2018 and again in October 2018. Such revisions went into effect in January 2020.

financial statements in interpreting the information contained in financial statements prepared in compliance with IFRS.

105.    The *Conceptual Framework* states that for financial information to be useful it must be relevant and faithfully represent what it purports to represent.

106.    Materiality is an inherent part of relevance. The *Conceptual Framework* discusses relevance as follows:

> Relevant financial information is capable of making a difference in the decisions made by users…
>
> Financial information is capable of making a difference in decisions if it has predictive value, confirmatory value or both…
>
> Information is material if omitting it or misstating it could influence decisions that users make on the basis of financial information about a specific reporting entity. In other words, materiality is an entity-specific aspect of relevance based on the nature or magnitude, or both, of the items to which the information relates in the context of an individual entity's financial report. …
>
> **To be useful, financial information must not only represent relevant phenomena**, **but it must also faithfully represent the substance of the phenomena that it purports to represent**.

(Emphasis added.)

107.    The *Conceptual Framework* also states that a "complete depiction" must include all information necessary for an investor to understand what is being described:

> **A complete depiction includes all information necessary for a user to understand the phenomenon being depicted, including all necessary descriptions and explanations.** For example, a complete depiction of a group of assets would include, at a minimum, a description of the nature of the assets in the group, a numerical depiction of all of the assets in the group, and a description of what the numerical depiction represents (for example, historical cost or fair value). **For some items, a complete depiction may also entail explanations of significant facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature, and the process used to determine the numerical depiction**.

Information must both be relevant and faithfully represented if it is to be useful. Neither a faithful representation of an irrelevant phenomenon nor an unfaithful representation of a relevant phenomenon helps users make good decisions. The most efficient and effective process for applying the fundamental qualitative characteristics would usually be as follows (subject to the effects of enhancing characteristics and the cost constraint, which are not considered in this example). First, identify an economic phenomenon that has the potential to be useful to users of the reporting entity's financial information. Second, identify the type of information about that phenomenon that would be most relevant if it is available and can be faithfully represented. Third, determine whether that information is available and can be faithfully represented. If so, the process of satisfying the fundamental qualitative characteristics ends at that point. If not, the process is repeated with the next most relevant type of information….

***Enhancing qualitative characteristics should be maximised to the extent possible***. However, the enhancing qualitative characteristics, either individually or as a group, cannot make information useful if that information is irrelevant or does not provide a faithful representation of what it purports to represent.

(Emphases added).

108.    IAS 1 concerns the "Presentation of Financial Statements." That provision provides in pertinent part:

This Standard prescribes the basis for presentation of general purpose financial statements to ensure comparability both with the entity's financial statements of previous periods and with the financial statements of other entities. It sets out overall requirements for the presentation of financial statements, guidelines for their structure and minimum requirements for their content.

**Scope**

**An entity shall apply this Standard in preparing and presenting general purpose financial statements in accordance with International Financial Reporting Standards (IFRSs).**

(Emphasis in original).

109.    Under IAS 1, financial statements must "provide information about the financial position, financial performance and cash flows of an entity that is useful to a wide range of users in making economic decisions." IAS 1.9. Information about assets, liabilities, income and expenses, and cash flows, together with the information in the notes to the financial statements

"assists users of financial statements in predicting the entity's future cash flows and, in particular, their timing and certainty." *Id*

110.     IAS1 also mandates that "[f]air presentation requires the faithful representation of the effects of transactions, other events and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the Framework." IAS 1.15.

111.     IAS 1 defines materiality as follows:

Omissions or misstatements of items are material if they could, individually or collectively, influence the economic decisions that users make on the basis of the financial statements. ***Materiality depends on the size and nature of the omission or misstatement judged in the surrounding circumstances***. The size or nature of the item, or a combination of both, could be the determining factor.

112.     As detailed above, the Registration Statement and Proxy Statement and Prospectus, and the respective amendments thereto, incorporated Old Li-Cycle's audited financial statements for FY2019 and FY2018, which purported to report Old Li-Cycle's results of operations pursuant to and in conformity with applicable International Financial Reporting Standards ("IFRS").

113.     After the Business Combination, Li-Cycle has continued to assert that its financial statements—including in its initial Form 20-F Annual Report and subsequent periodic filings—are prepared and presented in conformity with IFRS.

114.     As further described below, Li-Cycle's financial reporting was materially noncompliant with the applicable IFRS and IAS standards, with respect to as least two significant elements of Li-Cycle's reported results of operations: (1) recognition of revenue; and (2) recognition and adjustment of accounts receivable.

**Li-Cycle Recognized Revenue and Receivables Before Prematurely, in Violation of IFRS 9 and 15**

115. The timing and method of recognizing revenue from sale of goods to customers is governed by IFRS 15, *Revenue for Contracts with Customers.*

116. Under IFRS 15.9, *Recognition,* an entity may recognize revenue from a contract with a customer only when "it is probable that the entity will collect the consideration to which it will be entitled in exchange for the goods or services that will be transferred to the customer." A contract ***does not exist*** , if (in relevant part) (a) the entity "has not yet transferred any promised goods or services to the customer,"; and (b) "the entity has not yet received, and is not yet entitled to receive, any consideration in exchange for the promised goods or services." IFRS ¶15.12. When a contract does not meet these requirements, and an entity receives consideration from the customer, the entity may recognize the received consideration as revenue ***only if*** : (a) the entity has "***no remaining obligation*** to transfer goods or services to the customer, and ***all, or substantially all, of the consideration promised by the customer has been received by the entity and is non-refundable***", or (b) "the contract has been terminated and the consideration received from the customer ***is non-refundable***."

117. Accounting for financial assets, including accounts receivable, is governed by IFRS 9, *Financial instruments,* in conjunction with the relevant provisions of IFRS 15, *Revenue for Contracts with Customers.*

118. IFRS 9, ¶5.1, *Initial measurement,* provides that trade receivables—amounts collectible from a customer pursuant to a contract for the sale of goods—shall be measured (2) "***at their transaction price*** (as defined in FRS 15) if the trade receivables do not contain a significant financing component in accordance with IFRS 15"; or (2) where the entity chooses to employ the "practical expedient" provided by IFRS 15.63—which is available even if there is a

42

significant financing component, but where the receivable is expected to be collected in less than 12 months from the date of its recognition. IFRS 9.5.1.3, IFRS 15.63.

119.    As revenue is recognized only when the transaction price is set and the seller's performance is complete, any receivable must be recognized at the same time, and its amount is and must be fixed as of that date. If the final transaction price is not set, and all (or substantially all) of the customer's ultimate payment has been received, revenue recognition (and therefore the recording of a receivable) is premature.

**Li-Cycle Improperly Recognized Gains on Accounts Receivable, in Violation of IFRS 5 and 15**

120.    After initial recognition of a trade receivable under IFRS 9.5.1.3 and IFRS 15, subsequent adjustment of the receivable is governed by IFRS 9.5.5, *Impairment.* "The objective of the impairment requirements is to recognize lifetime expected credit losses for all financial instruments for which there have been significant increases in credit risk since initial recognition—whether assessed on an individual or collective basis—considering all reasonable and supportable information, including that which is forward-looking." IFRS 5.5.4. "An entity shall recognize, as an *impairment gain or loss*, the amount of expected credit losses (or reversal) that is required to adjust the loss allowance at the reporting date to the amount that is required to be recognized in accordance with the standard." IFRS 9.5.5.8. (Emphasis in original).

121.    With respect to trade receivables, IFRS 9.5.5.15 prescribes a simplified aggregate approach, such that the entity "shall always measure the loss allowance at an amount equal to lifetime expected credit losses" for "trade receivables…that result from transactions that are within the scope of IFRS 15 (*Revenue for contracts with customers)*, and that […] do not contain a significant financing component in accordance with IFRS 15 (or when the entity applies the practical expedient in accordance with paragraph 63 of IFRS 15)…"

122.    Even in cases where the receivable in question contains a "significant financing component," i.e., where a component of interest is priced into the ultimate receivable upon settlement, the different in price attributable to the interest component is recorded in profit or loss by the entity extending the receivable as revenue from interest. IFRS 9.5.4, *Amortized cost measurement*. Under no circumstances is an adjustment to a receivable reported as a revenue from sales.

123.    IFRS provides no basis to support recognition of fair-value gains on a trade receivable. Even if the contract at issue is for purchase at a variable price, the variable price is fixed (at latest) upon delivery. IFRS does not permit the recognition of revenue until the seller's performance is complete—in the context of a sale of goods, the date on which the customer receives the goods. The seller cannot have exposure to changes in the price of the underlying commodity after the date of delivery—the price is set, at latest, when the seller's performance finished. Under IFRS, if the seller continues to have exposure to price risk, revenue recognition is premature.

**As a Result of Li-Cycle's Premature Recognition of Revenues and Receivables and Subsequent "Mark-to-Model" of its Receivables, it Reported Results of Operations were Materially Misstated**

124.    Li-Cycle's premature recognition of revenue for the full amount it ***projected*** to receive under its "model", together with premature recording of a receivable for future amounts which had not yet been received and remained unsettled, and subsequent recognition of ***additional*** revenue by recording holding gains on its accounts receivable based on projected future increases in commodity prices under its "model", caused Li-Cycle's reported revenue, assets (through accounts receivable), operating margin, operating profit, and earnings to be materially overstated at all relevant times.

125.    By way of example, in Li-Cycle's consolidated financial statements for the first quarter of FY 2022 ("1Q22"), Li-Cycle recorded total revenues of $3,837,970, of which $1,738,469—fully **_45%_** of its reported revenue for the period—was actually composed on putative gains from "Mark-to-Model" of its recorded accounts receivable.

126.    During the same period, Li-Cycle's reported accounts receivable rose from $4,072,701 to $5,815,394—a total increase of $1,742,693.

127.    Thus, Li-Cycle's "Mark-to-Model" recognition of gains on its existing receivables accounted for **_99.8%_** of the increase in this asset for the three-month period. The net actual increase in accounts receivable for the period was a mere $4,224.00. Li-Cycle thus recorded $1,738,469 in gains on prior-period receivables of $4,072,701— implying an anticipated increase of **_42.68%._** In the same period, the Company assessed an allowance for credit loss on its accounts receivable of **_$0.00_**—in other words, taking that position that it expected to collect 100% of its recorded receivables for the period.

128.    Li-Cycle's aggressive markup of its outstanding receivables is belied by its simultaneous treatment of its recorded inventory. In the same quarter, Li-Cycle's reported inventory rose from $1,197,807 to $2,881,047—a total increase of $1,683,240. However, its cost of inventory—recorded as an expense—was $2,446,381 for the same period, implying a **_loss_** on extraction operations of **_$763,141_**, or **_31%_**. The Company's loss on inventory for the period was driven primarily by a **_write-down_** adjustment of $660,517 (86% of the implied loss) "**_in respect to adjustments of inventory to net realizable value_**," with net realizable value being "calculated as the estimated consideration under provisional pricing arrangements less estimated cost of completion and the estimated cost necessary to make the sale."

129.    Thus, Li-Cycle simultaneously recognized huge **_gains_**—approximately **_42.68_**%—on its receivables, ostensibly based on projected **_increases_** in the commodity prices of Li-Cycle's products, while simultaneously recording large **_losses_**—approximately **_31%_**—on the "net realizable value" of the same commodities.

130.    In this matter, Li-Cycle overstated its 1Q22 revenue by at least **_45%_**--based solely on its improper "Mark-to-Model" recognition of gains on its outstanding accounts receivable, while overstating its recorded receivables **_42.68%_** and the period increase in those receivables by **_99.8%._**

131.    However, even these substantial overstatements do not account for Li-Cycle's premature recognition of revenue based on the receipt of "provisional price" payments from Traxys under its interest-bearing Working Capital Facility. Li-Cycle's fail to report information on the aging or collections of its accounts receivable, or of cash received from sales. The above analysis assumes that Li-Cycle actually finalized and collected **_none_** of its prior-period reported accounts receivable during 1Q22. If Li-Cycle did, in fact, collect on any of its receivables during the period, this would imply an even **_greater_** proportionate impact of its "Mark-to-Model" gain recognition on its reported revenue. Absent Li-Cycle's reported gains on its accounts receivable, its reported revenue for 1Q22 would have been $2,099,501, approximately **_61%_** of which would be attributable to Traxys, substantially all of which was likely prematurely recognized under applicable IFRS, as discussed above.

132.    Taken together, Li-Cycle's revenue attributable to Traxys and its "Mark-to-Model" gains recognized on accounts receivable accounted for **_more than_** **_half_** of its reported revenue for 1Q22—a clearly material overstatement of a crucial market of financial performance.

**Li-Cycle's Statements Regarding Recognition of Revenue and Accounts Receivable in the Registration Statement and Proxy Statement and Prospectus Were False and Materially Misleading**

133.    As more fully stated in the foregoing sections (which are incorporated as if fully set forth herein), the Registration Statement and the Proxy Statement and Prospectus represented that Li-Cycle's financial statements and Management's Discussion & Analysis ("MD&A") thereto, as incorporated and reflected therein, were prepared and presented in accordance with International Financial Reporting Standards ("IFRS").

134.    The Registration Statement stated, in relevant part, that:

"[f]or sales of products, ***revenue is recognized when control of the goods has transferred,*** meaning when good have been shipped to the customer's location (delivery). ***A receivable is recognized by Li-Cycle when the goods are delivered to the customer as this represents the point in time at which the right to consideration becomes unconditional, as passage of time it the only condition to payment becoming due***."

(Emphases added)

135.    The Registration Statement further stated that "The Company recognizes revenue when it transfers control of a product or service to a customer. There are no significant financing components associated with the Company's payment terms."

136.    The incorporated MD&A, in its discussion of revenue recognition, stated that:

"For sales of products***, revenue is recognized when control of the goods has been transferred, meaning when the goods have been shipped to the customer's location (delivery)***. A receivable is recognized by Li-Cycle when the goods are delivered to the customer ***as this represents the point at which time the right to consideration become unconditional***, as passage of time is the only condition to payment becoming due. The ***revenue recognized is based on commodity prices at the time of delivery***. Under Li-Cycle's standard contract terms, customers do not have a right of return….**.**".

(Emphases added)

137.    The incorporated notes to the financial statement further stated that:

 "***The Company recognizes revenue when it transfers control of a product or service to a customer. There are no significant financing components associated with the Company's payment terms***."

(Emphasis added)

138.     The Registration Statement and Proxy Statement and Prospectus also each incorporated Li-Cycle's discussion of its accounting for "Financial instruments," which listed "Trade accounts receivables" as being measured at a "Fair Value, either through Profit or Loss" ("FVTPL") basis, with "Other accounts receivable" being recorded at "Amortized cost." They stated, in relevant part:

> "The classification and measurement of financial assets after initial recognition at fair value depends on the business model for managing the financial asset and the contractual terms of the cash flows. ***Financial assets that are held within a business model whose objective is to collect the contractual cash flows, and that have contractual cash flows that are solely payments of principal and interest on the principal outstanding, are generally measured at amortized cost at each subsequent reporting period***. … All other financial assets are measured at their fair values at each subsequent reporting period, with any changes recorded through profit and loss or through other comprehensive income (which designation is made as an irrevocable election at the time of recognition). After initial recognition at fair value, financial liabilities are classified and measured at either: (i) amortized cost; ***(ii) FVTPL, if the Company has made an irrevocable election at the time of recognition, or when required (for items such as instruments held for trading or derivatives);*** or, (iii) FVTOCI, when the change in fair market value is attributable to changes in the Company's credit risk.

(Emphases added).

139.     Each of these statements was false and materially misleading when made. Rather than recognizing revenue upon delivery to the customer upon "delivery," Li-Cycle recognized revenue for the full projected amount of a sale months before delivery, based on the receipt of "provisional payments" from its broker, Traxys—extensions of a Working Capital Facility for

which Li-Cycle owed Traxys interest, and could be required to repay in the event the price of the goods dropped before a sale was finalized.

140.    Rather than recognizing an account receivable when "goods are delivered to the customer" and "the right to consideration [becomes] unconditional," Li-Cycle recognized accounts receivable for the full amount it anticipated to receive before a final price was even set—or even before a customer had been identified.

141.    Li-Cycle booked the value of its accounts receivable at "Fair Value, either through Profit or Loss" ("FVTPL") basis, despite the fact that receivables are clearly "[f]inancial assets that are held within a business model whose objective is to collect the contractual cash flows," and Li-Cycle represented that there were "no significant financing components associated with the Company's payment terms," and therefore, such receivables should have been valued at amortized cost under applicable IFRS standards.

142.    Li-Cycle's representation that there were "no significant financing components associated with the Company's payment terms" was likewise false and materially misleading, as its arrangement with Traxys specifically incorporated financing (and payment of interest by Li-Cycle) under the Working Capital Facility.

143.    Each of the above statements materially misrepresented the reality underlying Li-Cycle's reported results of operations as incorporated into the Registration Statement and the Proxy Statement and Prospectus, and thereby rendered the incorporated financial reports, results of operations, and associated MD&A materially misleading.

## F.    CAUSES OF ACTION UNDER THE EXCHANGE ACT

## COUNT I

**Violation of Section 14(a) of The Exchange Act and Rule 14a-9
Against the Peridot Defendants**

144.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

145.    The claims set forth herein do not sound in fraud and are based on the negligent conduct of the Defendants named herein (the "Peridot Defendants").

146.    The Peridot Defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 thereunder in that these Defendants solicited proxies from Plaintiffs and other members of the Class by means of a Proxy Statement that through Defendants' negligence contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts, and omitted to state material facts necessary in order to make the statements therein not false or misleading.

147.    Plaintiff and other members of the Class were misled by the Peridot Defendants' false and misleading statements and omissions, were denied the opportunity to make an informed decision in voting on the Business Combination, and approved the Business Combination without having been advised of material facts. Accordingly, Plaintiffs and other members of the Class did not receive the fair value of their shares and the business of the combined entity, suffered damages when the Company's stock price decreased, and were prevented from benefitting from a value-maximizing transaction.

### G.    CAUSES OF ACTION UNDER THE SECURITIES ACT

**COUNT II**

**Violation of Section 11 of the Securities Act
Against the Li-Cycle Defendants**

148.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

149.    This Cause of Action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against the Li-Cycle Defendants.

150.    The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

151.    The Li-Cycle Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions.

152.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the above-identified statements contained in the Registration Statement  were true and without omissions of any material facts and were not misleading.

153.    By reason of the conduct herein alleged, each Defendant named herein violated, and/or controlled a person who violated, Section 11 of the Securities Act.

154.    Plaintiff acquired Li-Cycle common stock pursuant and/or traceable to the Registration Statement.

155.    Plaintiff and the Class have sustained damages. As of the filing of the initial complaint in this Action, the value of Li-Cycle ordinary shares has declined substantially from its Business Combination price.

156.    At the time of their acquisition of Li-Cycle ordinary shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures

herein. Less than one year elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action. Less than three years elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

**COUNT III**

**Violation of Section 15 of the Securities Act
Against the Li-Cycle Individual Defendants**

157.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

158.    This Cause of Action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against the Li-Cycle Individual Defendants.

159.    The Li-Cycle Individual Defendants each were control persons of Li-Cycle by virtue of their positions as directors and/or senior officers of Li-Cycle's predecessor entities immediately prior to the Business Combination. Li-Cycle The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Li-Cycle.

160.    The Li-Cycle Individual Defendants each had a financial interest in conducting the Business Combination, and the Li-Cycle Individual Defendants were each critical to effecting the Business Combination, based on their signing and/or their authorization of the signing of the Registration Statement, by participating to execute the Business Combination, and by having otherwise directed through their authority the processes leading to execution of the Business Combination, including obtaining underwriters, registration, qualification,

authorization, pricing, offering to the public, and issuance and sale of the shares in the Business Combination.

161.    By reason of such wrongful conduct, the Li-Cycle Individual Defendants are liable pursuant to Section 15 of the Securities Act.

### H.    CLASS ACTION ALLEGATIONS APPLICABLE TO ALL CLAIMS

162.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who: (1) held common stock of Peridot Acquisition Corp. ("Peridot" or "PDAC") and were eligible to vote at PDAC's extraordinary general meeting on as on August 5, 2021, seeking to pursue remedies under Section 14(a) of the Exchange Act, and/or; (2) purchased or otherwise acquired Li-Cycle Holdings Corp. ("Li-Cycle" or the "Company") Ordinary Shares pursuant or traceable to the Company's Registration Statement and/or the Proxy Statement and Prospectus issued in connection with the August 10, 2021 Business Combination (as defined herein), seeking to pursue remedies under Sections 11 and 15 of the Securities Act. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

163.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class because 168,891,877 ordinary shares and more than 20,300,000 warrants to purchase ordinary shares were outstanding as of the Company's most

recent Form 20-F Annual Report.. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

164.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

165.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

166.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Li-Cycle Defendants violated the Sections 11 and/or 15 of the Securities Act of 1933;

(b) whether the Peridot Defendants violated the Section 14(a) of the Securities Exchange Act of 1934;

(c) whether the Registration Statement contained untrue statements of material fact or omitted material information required to be stated therein;

(d) whether the Registration Statement omitted material facts necessary in order to make the statements made therein not misleading;

(e) whether the Proxy Statement and Prospectus contained untrue statements of material fact or omitted material information required to be stated therein;

(f) whether the Proxy Statement and Prospectus omitted material facts necessary in order to make the statements made therein not misleading;

(g) the extent of damage sustained by Class members, and the appropriate measure of damages.

167. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## I.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## J.    **DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: October 11, 2022            Respectfully submitted,

                                   **THE ROSEN LAW FIRM, P.A.**

                                   */s/ Brent J. LaPointe*
                                   Phillip Kim, Esq. (PK 9384)
                                   Laurence M. Rosen, Esq. (LR 5733)
                                   Brent J. LaPointe (NY 4972923)
                                   275 Madison Ave., 40th Floor
                                   New York, NY 10016
                                   Tel: (212) 686-1060
                                   Fax: (212) 202-3827
                                   Email: pkim@rosenlegal.com
                                   Email: lrosen@rosenlegal.com
                                   Email: blapointe@rosenlegal.com

                                   *Counsel for Lead Plaintiff and the Class*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on October 11, 2022, a copy of this document was served on all counsel of record by operation of the Court's electronic filing system.

                                   */s/ Brent J. LaPointe*
                                   Brent J. LaPointe