# EXHIBIT E

Table of Contents

As filed with the Securities and Exchange Commission on May 13, 2021

Registration No. 333-254843

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

# Amendment No. 1
# to
# FORM F-4
# REGISTRATION STATEMENT

*UNDER*
*THE SECURITIES ACT OF 1933*

# LI-CYCLE HOLDINGS CORP.

**(Exact name of registrant as specified in its charter)**

| Ontario | 6770 | Not applicable |
|---|---|---|
| **(State or other jurisdiction of** | **(Primary Standard Industrial** | **(I.R.S. Employer** |
| **incorporation or organization)** | **Classification Code Number)** | **Identification No.)** |

**c/o Peridot Acquisition Corp.**
**2229 San Felipe Street, Suite 1450**
**Houston, TX 77019**
**(713) 322-7310**

**(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)**

**Li-Cycle Corp.**
**2351 Royal Windsor Dr. Unit 10**
**Mississauga, ON L5J 4S7**
**(877) 542-9253**

**Puglisi & Associates**
**850 Library Avenue, Suite 204**
**Newark, DE 19715**
**(302) 738 -6680**

**(Name, address, including zip code, and telephone number, including area code, of agent for service)**

*Copies to:*

| Debbie P. Yee, P.C. | Warren M. Katz | Paul M. Tiger | Jonathan Grant |
|---|---|---|---|
| Michael W. Rigdon | Dominique Rolland | Andrea M. Basham | Fraser Bourne |
| Kirkland & Ellis LLP | Stikeman Elliott LLP | Freshfields Bruckhaus Deringer LLP | McCarthy Tétrault LLP |
| 609 Main Street | 1155 René-Lévesque Blvd. West, 41st Floor | 601 Lexington Avenue, 31st Floor | 66 Wellington Street West, Suite 5300, TD Bank |
| Houston, Texas 77002 | Montréal, Quebec H3B 3V2 | New York, New York 10022 | Tower Box 48 |
| Tel: (713) 836-3600 | Tel: (514) 397-3000 | Tel: (212) 277-4000 | Toronto, Ontario M5K 1E6 |
| | | | Tel: (416) 362-1812 |

**Approximate date of commencement of proposed sale to the public**: As soon as practicable after this Registration Statement becomes effective and all other conditions to the Business Combination contemplated by the Business Combination Agreement described in the included proxy statement/prospectus have been satisfied or waived.

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If applicable, place an X in the box to designate the appropriate rule provision relied upon in conducting this transaction:

Exchange Act Rule 13e-4(i) (Cross-Border Issuer Tender Offer) ☐

Exchange Act Rule 14d-1(d) (Cross-Border Third-Party Tender Offer) ☐

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933.

Emerging growth company ☒

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012

**CALCULATION OF REGISTRATION FEE**

| Title of each class of security to be registered | Amount to be registered[(1)] | Proposed maximum offering price per security | Proposed maximum aggregate offering price | Amount of registration fee[(8)] |
|---|---|---|---|---|
| Common Shares[(2)(3)(6)] | 65,846,122 | $10.56 | $695,335,048 | $75,861 |
| Warrants[(4)(6)] | 15,000,000 | $11.50 | $172,500,000 | $18,820 |
| Common Shares issuable upon exercise of Warrants[(5)(6)] | 15,000,000 | — [(7)] | — [(7)] | — [(7)] |
| Total | | | | $94,681[(9)] |

(1) All securities being registered will be issued by Li-Cycle Holdings Corp., an Ontario corporation ("Newco"). In connection with the business combination described in the enclosed proxy statement/prospectus ("Business Combination"), (a) Peridot Acquisition Corp. ("Peridot") will continue as a corporation existing under the laws of the Province of Ontario ("Peridot Ontario"), and in connection therewith, the Class A ordinary shares and Class B ordinary shares of Peridot (together, the "Peridot Shares") and issued and outstanding warrants of Peridot will convert into an equal number of Class A common shares, Class B common shares and warrants to purchase Class A common shares of Peridot Ontario, (b) the Peridot Ontario Class B common shares will convert into Class A common shares of Peridot Ontario on a one-for-one basis, (c) Peridot Ontario and Newco will amalgamate (the "Amalgamation" and Peridot Ontario and Newco as so amalgamated, "Amalco"), and in connection therewith, the Class A common shares and warrants to purchase Class A common shares of Peridot Ontario will be exchanged for an equal number of common shares of Amalco (the "Amalco Shares") and warrants to purchase an equal number of Amalco Shares (the "Amalco Warrants"), and the common share in Newco held by Li-Cycle will be exchanged for an Amalco Share, (d) following the Amalgamation, the Amalco Share held by Li-Cycle will be purchased for cancellation by Amalco for cash equal to the subscription price for the common share in Newco for which such Amalco Share was exchanged pursuant to the Amalgamation, and (e) the preferred shares of Li-Cycle will convert into common shares of Li-Cycle and, on the terms and subject to the conditions set forth in a plan of arrangement, Amalco will acquire all of the issued and outstanding common shares of Li-Cycle (the "Li-Cycle Shares") from Li-Cycle's shareholders (the "Li-Cycle Holders") in exchange for Amalco Shares having an aggregate equity value of $975 million (the "Share Exchange").

(2) Consists of (i) 30,000,000 Amalco Shares issuable to Peridot shareholders (other than holders of Peridot's Class B ordinary shares) in connection with the Amalgamation and (ii) 35,846,122 Amalco Shares issuable to Li-Cycle Holders (other than Li-Cycle Holders subject to the Li-Cycle Transaction Support Agreements (as defined herein)) in connection with the Share Exchange and shares issuable upon exercise of Amalco Options (as defined herein).

(3) Pursuant to Rules 457(c) and 457(f)(1) under the Securities Act of 1933, as amended (the "Securities Act"), and solely for the purpose of calculating the registration fee, the proposed maximum aggregate offering price is equal to the product obtained by multiplying $10.56, which represents the average of the high and low prices of Class A Shares of Peridot on the New York Stock Exchange on March 24, 2021, by 65,846,122, the estimated number of Amalco Shares that will be issuable (other than to certain holders as described in footnote 2 above) in connection with the closing of the Business Combination (including Peridot Class A ordinary shares that may be redeemed pursuant to the terms of Peridot's amended and restated certificate of incorporation).

(4) Consists of warrants of Amalco issuable for outstanding warrants of Peridot Ontario in connection with the Amalgamation, which includes 15,000,000 warrants issued in connection with Peridot's initial public offering.

(5) Consists of the Amalco Shares issuable upon exercise of Amalco Warrants. Each warrant will entitle the warrant holder to purchase one Amalco Share at a price of $11.50 per share (subject to adjustment).

(6) Pursuant to Rule 416(a), there are also being registered an indeterminable number of additional securities as may be issued to prevent dilution resulting from stock splits, stock dividends or similar transactions.

(7) No separate registration fee required pursuant to Rule 457(g) under the Securities Act of 1933, as amended.

**Exhibit 10.12**

**Confidential portions of this exhibit have been omitted because it is both (i) not material and (ii) would be competitively harmful if publicly disclosed. The redacted terms have been marked at the appropriate place with "[XXX]".**

TRAXYS

September 24th, 2020

BETWEEN **Traxys North America LLC**
a limited liability company organized under the laws of Delaware, with its main office and principal place of business at
299 Park Avenue
New York, NY 10171
USA

AND **Li-Cycle Corp.**
2351 Royal Windsor Dr., Unit 10
Mississauga, ON L51457
Canada
Hereinafter called "Seller"

**BLACK MASS—Marketing, Logistics and Working Capital Agreement**

Dear Sirs,

We, Buyer, are pleased to have concluded with you, Seller, this sales contract as per the terms and conditions stated hereinafter:

TRAXYS North America LLC ("Buyer", "Traxys" or "we") shall buy from "Seller", ("Seller", "Li-Cycle" or "you") 100% of the annual production of Black Mass ("Concentrate" or "Material" or "Black Mass"), with analyses as set out below, from North America Commercial Spoke 1 ("Spoke 1", in Kingston, Ontario, Canada), North America Commercial Spoke 2 ("Spoke 2", in Rochester, NY, USA)and from any other Commercial Spoke where Li-Cycle has rights to the Black Mass production until such time as the Spoke/s Material/s are integrated by the Seller into its Hubs (namely, with regards to all Material other than Material which will be consumed by the Sellers' Hubs or directly consumed by other JV partners of the Spokes in their capacity as end-users of said Material). This agreement shall be subject to the terms and conditions hereinafter set forth.

**1 QUALITY**

Typically, of the following approximate target analysis as per production at the Seller's operations:

**Form:** [XXX]

**Chemical properties:**

| Property | Unit | |
|---|---|---|
| [XXX] | wt% | 2 — 15% |
| [XXX] | wt% | 10 — 25% |
| [XXX] | wt% | >15% |
| [XXX] | wt% | 5 — 25% |
| [XXX] | wt% | 1 — 2% |
| [XXX] | PPM | <3 |

TRAXYS

**11    LICENSES, TAXES, EXPENSES**

11.1    Any and all taxes and duties, whether now existing or new, imposed outside of the country of origin on the export of the Material shall be borne by Seller.

**12    INSURANCE**

Buyer shall insure under its marine cargo policy with an internationally reputable company, from the time the Material is under Buyer's title and control and up to the destination point for 110% of the provisional value of the Material. The insurance shall cover All Risks as per current Institute Cargo Clauses All Risks, Institute War Clauses and Institute Strike, Riots and Civil Commotions clauses. The claim shall be payable in US Dollars.

**13    TITLE AND RISK**

13.1    Title to the Material for each shipment or any part thereof shall pass from Seller to Buyer upon receipt by Seller of the Provisional Payment as per clause 8.1 (Payment) of this agreement.

13.2    Risk of loss or damage to the Material shall pass from Seller to Buyer as per agreed incoterm in clause 5 (Incoterms® 2020).

**14    INCOTERMS**

Unless otherwise specified herein, Incoterms® 2020 shall be applicable for the execution of this agreement.

**15    CHANGES IN QUOTATIONS**

The quotations of the metals specified under this agreement are those actually in general use to establish the price of metallic contents in concentrates. Should any of these quotations cease to exist or cease to be published or cease to be internationally recognized as the basis to calculate ore and/or concentrate contracts, or should they fail to reflect the real value of the metals in the markets, then (at the request of any of the parties), Buyer and Seller shall get together and mutually consult with the aim to agree on a new basis and price, and a date to execute same. The basic objective shall be the continuity of a fair price.

**16    FORCE MAJEURE**

Neither Buyer nor Seller would be responsible for non-performance under this agreement provided such non-performance is due to the occurrence of an event of Force Majeure as hereunder described:

16.1    In the event of any war (declared or undeclared), revolution, terrorism, act of God, flood, storm, earthquake, fire, explosion, strike, lockout, act of Government or Government appointed agents including but not limited to changes in tariffs, duties, import and export controls or quotas, and environmental regulations, obstruction or blockage of port or wharf, lack of railway facilities or delays on route whether due to mechanical fault or action of the elements, or in the event of any other like events or causes whatsoever beyond the reasonable control of Seller or Buyer which were not reasonably foreseeable and which could not be reasonably avoided (any such cause being hereinafter called "Force Majeure") preventing or hindering Seller or Buyer from performing its obligations in this agreement, the party whose performance is prevented or hindered by Force Majeure may suspend delivering or accepting a delivery of Material hereunder for the period of the Force Majeure event (but no longer) if it shall give prompt written notice to the other party of the details of such Force Majeure event, and an estimate of the time period for which the Force Majeure event shall remain in effect. Force Majeure shall not apply to any tonnage for which a pricing has been established in part or in full or transport of any kind has been booked. In no event shall Force Majeure operate to delay or extend the due date for any repayments of principal or interest of any loans or advances extended to Seller by Buyer or an affiliate of Buyer.

TRAXYS

The party declaring Force Majeure shall take all reasonable steps to resume with the least possible delay its performance hereunder, provided that nothing herein shall require a party to settle any strike, lockout or stoppage of work on terms which in its opinion are not satisfactory.

16.2    Each party is fully aware of the potential impact on the performance of the other party's obligations under this Agreement arising out of the COVID-19 pandemic and governmental and other actions that have been taken or may in the future be taken in response thereto, and each party acknowledges that the awareness of such event or condition will not act to prevent the other party from declaring a Force Majeure event that otherwise would be applicable hereunder.

**17    NOTICES**

It is agreed that any and all notices required or permitted to be given to either party under the terms of this agreement shall be given in writing under envelope with postage prepaid and duly addressed and sent by registered airmail to the party to be notified at the following respective addresses or any new addresses regarding which the respective parties have been informed to the sending of such notices, or by facsimile namely:

>   Li Cycle Corp.
>   2351 Royal Windsor Dr, Unit 10
>   Mississauga, ON
>   L6J 7A2
>   Canada
>   Attention: Bruce MacInnis
>
>   Traxys North America, LLC
>   299 Park Avenue, 38th Floor
>   New York, NY 10171
>   USA
>   Facsimile: +1-212-918-8071
>   Attention: Cobalt Department

Any notice permitted or required to be given hereunder shall be validly given if in writing and sent by facsimile, and prepaid registered first class mail, or delivered by hand to the party to which the notice is directed at the above address or, in either case, such other address as may be notified by the relevant party to the other.

Any such notice shall be deemed to have been given 24 (twenty-four) hours after dispatch, the next business day in the place to which it is sent (if sent by fax with a transmission report confirming completed transmission to the required number), 10 days after posting (if by mail) or at the time of delivery (if by hand). In the event that notice is given by fax then the party so doing shall also mail the original the same day.

**18    GOVERNING LAW**

This agreement shall be governed by, and interpreted in accordance with, the laws of New York, USA, without regard to its principle of conflicts of laws.

**19    DISPUTE RESOLUTION**

Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration administered in New York by the American Arbitration Association ("AAA") in accordance with its Commercial Arbitration Rules then in effect. Each party shall by written notice to the other have the right to appoint one arbitrator. If, within thirty (30) days following the giving of such notice by one party, the other shall not, by written notice, appoint another arbitrator, the first arbitrator shall be

TRAXYS

**24    SEVERABILITY**

Whenever possible, each provision of this agreement shall be interpreted in such a manner as to be effective and valid under the applicable laws. However, if any provision of this agreement shall be held to be invalid or prohibited under applicable laws, such provision shall be ineffective only to the extent of such invalidity or prohibition without affecting the validity of the remainder of such provision or the remaining provisions of this agreement, which shall remain in full force and effect.

**25    TERMINATION**

Each party may terminate this agreement by written notice, with immediate effect:

25.1    If the other party commits a breach of its obligations under this Contract and, when such breach is capable of being remedied, fails to remedy such breach within a reasonable time (not less than 30 days) of written notice of breach;

25.2    If the other party enters into liquidation, becomes insolvent, is declared bankrupt, enters into any kind of receivership or makes any arrangement or composition or assignment for the benefit of any creditor; or

25.3    as provided in clause 16 (Force Majeure).

**26    DEFINITIONS**

The terms "tonne" or "ton" means a metric ton of 1000 kilograms (Kgs) equivalent to 2,204.62 pounds avoirdupois, wet (WMT) or dry (DMT) basis as specifically stated herein;

The term "unit" means one per cent of the net dry weight.

"USD" or "US Dollar" is the currency of United States of America.

The term "troy ounce" is equivalent to 31,1035 grams.

"PPM" means part per million and is equivalent to one gram per ton.

"Kg" shall mean one kilogram, or 1,000 (one thousand) grams, 2.2046 (two decimal two zero four six) pounds.

"LME" shall mean the London Metal Exchange.

"MB" shall mean the Metal Bulletin

Any other abbreviations shall be as per the usual standard of the industry.

**27    NO OTHER AGREEMENT**

27.1    This Agreement supersedes all correspondence, orders, or confirmations of the parties with respect to matters covered hereby. For sake of clarity and avoidance of doubts only, the Parties acknowledge that they are and/or shall be entering additional memoranda and/or agreements with regards to refined materials (Hub Materials) distribution.

27.2    No modification or waiver of this Agreement or any right of any party hereunder shall be binding upon such party unless it is in writing and signed by an officer thereof.

27.3    No waiver by a party of any of delay, fault or breach shall be deemed a waiver of any other delay, default or breach.